In re INITIATIVE PETITION NO. 363, STATE QUESTION NO. 672.

No. 86375.

Supreme Court of Oklahoma.

Nov. 5, 1996.

---

Charles M. Sublett, Sublett & Shafer, Tulsa, for Protestant Hughes.

Kevin M. Abel, Terri S. Roberts, M. Sean Radcliffe, Pray, Walker, Jackman, William-son & Marlar, Tulsa, for Proponents, Better Opportunities for Oklahoma's Students & Taxpayers, Inc., and Steven R. Kelley, An Individual Citizen and for contestants in the ballot title appeal.

Neal Leader, Senior Assistant Attorney General, State Attorney General, Oklahoma City, for proponent of the Ballot Title.

Rep. James E. Hamilton, Oklahoma City, In support of Attorney General's Ballot Title.

OPALA, Judge.

This is an original proceeding, brought under the authority of 34 O.S.Supp.1992 § 8 [1], to challenge the legal sufficiency of Initiative Petition No. 363 [IP 363], State Question No. 672, and an appeal, authorized by 34 O.S.1991 § 10(A),[2] from the ballot title prepared by the Attorney General [AG].

We (a) *hold* that the initiative measure in question is legally sufficient for submission to the electorate and (b) *amend* those portions of the AG's substitute ballot title which are found deficient to inform the voters of the proposed measure's effect.

## I

### THE ANATOMY OF THE INITIATIVE PROCESS

Steven R. Kelley filed IP 363 on June 30, 1995 in the Secretary of State's office on behalf of Better Opportunities For Oklahoma's Students & Taxpayers, Inc. [proponents]. The initiative measure proposes for submission to the voters a new constitutional article that would legalize and regulate casino gambling in Oklahoma.[3] Wallace Hughes

1. The pertinent terms of 34 O.S.Supp.1992 § 8, are:

 C. * * * Upon order of the Supreme Court it shall be the duty of the Secretary of State to forthwith cause to be published, in at least one newspaper of general circulation in the state, a notice of such filing and the apparent sufficiency or insufficiency thereof and notice that *any citizen or citizens of the state may file a protest to the petition* or an objection to the count made by the Secretary of State, by a written notice to the Supreme Court of the state and to the proponent or proponents filing the petition, said protest to be filed within ten (10) days after publication. A copy of the protest or objection to the count shall be filed with the Secretary of State. * * * (Emphasis added.)

2. For the complete text of 34 O.S.1991 § 10(A), see *infra* note 43.

3. On October 16, 1995 the Secretary of State, by letter to the Chief Justice, (a) certified the petition contained 202,993 signatures and (b) that 149,252 was the number of signatures necessary to place the matter before the electorate in accordance with 34 O.S.Supp.1992 § 8(C). The Secretary of State published notice of the petition's filing on October 27, 1995. No challenge has

[protestant] pressed a protest to the measure, raising issues about the petition's "substance (constitutionality) and form." The measure was then submitted to the Attorney General. He *found* the ballot title "was not in harmony with the law" and *prepared .a substitute text.*

The court is called upon to determine whether the initiative petition is sufficient for submission to a vote of the electorate and, if so, whether the AG's ballot title complies with the law's requirements.[4]

## II

### THE PROPOSED MEASURE

The proposed measure would add a new article to the State Constitution. It would make four locations immediately eligible for authorized gaming—the pari mutual horse racing facilities at Remington Park in Oklahoma County and Blue Ribbon Downs in Sequoyah County,[5] anywhere in Love County and a specified tax district in Tulsa County. Until five years after the measure's approval by the voters, casino gambling would not be allowed in the remaining 73 counties. A seven-member state gaming commission would be created with authority to provide regulation and enforcement of casino gambling to be held at authorized gaming facilities. Also provided by the measure are criminal penalties for violation of gaming laws and legalization of obligations incurred in the course of authorized gaming. The commission would collect gaming fees from each licensed gaming facility operator, retaining

the legislatively-approved amount of its budget and initial operations cost. The remaining receipts would be earmarked for specific computer-related educational purposes, local governments, and correctional institutions.

## III

### THE CHALLENGES INTERPOSED TO THE PETITION'S SUFFICIENCY AND TO THE AG'S SUBSTITUTE BALLOT TITLE TEXT

Protestant, who challenges the legal sufficiency of IP 363, which proposes for submission to the electorate a new constitutional article that would legalize and regulate casino gambling, urges that the proposed measure is legally infirm because: (1) it would impermissibly restrict the exercise of Indian sovereignty in violation of the Supremacy Clause of the U.S. Constitution[6] and the Enabling Act of the Oklahoma Constitution,[7] (2) it would violate the 14th Amendment of the U.S. Constitution by impermissibly categorizing certain citizens or groups by race and/or national origin;[8] (3) it is contrary to the single-subject mandate of Art. 24, § 1, Okl. Const.,[9] and (4) its gist is misleading and deceptive.

Proponents challenge the AG's substitute ballot title on four grounds: (1) the AG's use of the word "gambling" instead of "gaming" implies a technical and biased meaning; (2) the AG's reference to the legalization and enforceability of gambling debts in the ballot title is a misstatement of the proposed amendment; (3) the AG's statement that the

---

been lodged to the numerical sufficiency of the signatures. Although proponents initially questioned the Secretary of State's signature count (which eliminated some signatures as invalid), their protest was later withdrawn.

**4.** For the statutory ballot title requirements, see 34 O.S.Supp.1994 § 9(B), *infra* note 41.

**5.** The terms of § 4(A)(1) of IP 363 are:

 A. Authorized Gaming shall be allowed at a Gaming Facility at each of the following locations:

 1. any horse racing track which has conducted pari-mutuel wagering for more than 500 days during the five (5) years preceding the filing date of an application to be a Licensed Operator at such location;

The AG's substitute ballot title states that IP 363 would authorize gambling at two racing tracks—Remington Park and Blue Ribbon Downs. *See infra* note 39. The proponents do not challenge this statement.

**6.** For the terms of the Supremacy Clause, see *infra* note 10.

**7.** For the pertinent provisions of the Oklahoma Enabling Act, see *infra* note 12.

**8.** For the pertinent provisions of the Equal Protection Clause of the 14th Amend., § 1, U.S.Const, see *infra* note 11.

**9.** For the pertinent terms of Art. 24, § 1, Okl. Const., see *infra* note 30.

measure opens the door for Indian tribes to engage in new forms of gambling is a purely speculative consequence; and (4) the textual allusion that state limits and standards would have limited or no effect on Indian gambling is a misstatement of the law.

## IV

## PROTESTANT'S CHALLENGE

### A.

### Supremacy Clause and Oklahoma Enabling Act Challenges

Protestant's constitutional challenge to the sufficiency of IP 363 centers on the measure's alleged impact on tribal casino gambling on Indian land. The *sole* provision that pertains to Indian tribes is in § 8(D) of the initiative in contest. Its terms are:

§ 8. Miscellaneous. * * *

D. Any compact or agreement concerning Class III gaming, as defined by federal law, as amended from time to time, between the State of Oklahoma and any Indian tribe shall *adopt the definition and*

*scope of Authorized Gaming* set forth in this Article, and *shall contain,* among any other permitted provisions, at least the *minimum standards for a Gaming Facility* provided in § 4.D of this Article. (Emphasis added.)

Protestant urges the § 8(D) mandate that tribal-state gaming compacts adopt IP 363's "definition and scope of Authorizing Gaming" and contain the "minimum standards for a Gaming Facility" facially violates the Supremacy [10] and Equal Protection Clauses [11] of the U.S. Constitution as well as the Enabling Act (Art. 1, §§ 1 and 3),[12] Art. 2, § 7 [13] and Art. 5, § 51 [14] of the Oklahoma Constitution. He contends (a) the measure's initial geographical limitation of casino gaming to four locations, as well as its five-year moratorium on gaming in the remaining counties, will impermissibly restrict casino gaming on Indian lands, (b) the measure's terms will be enforced on Indian land by state legislation and by gaming commission personnel, (c) Indian tribes presumably will be subject to a 10% tax on gaming proceeds and (d) the measure's mandated specifications for physical construction of gaming facilities [15] will be

10. Art. 6, cl. 2, U.S. Const., states in pertinent part:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the *supreme Law of the Land;* and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. (Emphasis added.)

11. The Equal Protection Clause of the 14th Amend., § 1, U.S. Const., commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." *Nordlinger v. Hahn,* 505 U.S. 1, 9, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992).

12. The terms of Art. 1, § 1, Okl. Const., are:

The State of Oklahoma is an inseparable part of the Federal Union, and the Constitution of the United States is the supreme law of the land.

The terms of Art. 1, § 3, Okl. Const., are:

The people inhabiting the State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction,

disposal, and control of the United States. Land belonging to citizens of the United States residing without the limits of the State shall never be taxed at a higher rate than the land belonging to residents thereof. No taxes shall be imposed by the State on lands or property belonging to or which may hereafter be purchased by the United States or reserved for its use.

13. The terms of Art. 2 § 7, Okl. Const., are:

No person shall be deprived of life, liberty, or property, without due process of law.

14. The terms of Art. 5 § 51, Okl. Const., are:

The Legislature shall pass no law granting to any association, corporation, or individual any exclusive rights, privileges, or immunities within this State.

15. The terms of § 4(D) of IP 363 are:

§ 4. Authorized Gaming.

* * * * * *

D. Each Gaming Facility shall conform to the following minimum standards and shall consist of: an enclosed, roofed, permanent building of a design approved by the Commission, containing not fewer than 1,000 gaming stations and covering not less than 30,000 square feet devoted to Authorized Gaming,

enforced upon gambling casinos in Indian country.

Protestant's constitutional challenges, which presuppose that the § 8(D) requirements for tribal-state gaming compacts make the measure's regulatory and enforcement provisions applicable to Class III gaming on Indian lands in violation of the Supremacy Clause, surmise that this restriction on the rights of Indians in the use of their lands would visit disparate treatment on a recognized minority—Native American Indians— and hence contravene federal gaming law [16] as well as certain federal constitutional jurisprudence.[17]

Proponents counter that protestant misapprehends § 8(D) of IP 363, which makes *no reference* to the five-year limitation or to the location of gaming facilities to be erected anywhere on Indian lands under a tribal-state gaming compact. According to proponents, this section does not establish standards for gaming on Indian land, but rather clarifies the state's obligations in negotiating two covenants of a tribal-state gaming compact under the Indian Gaming Regulatory Act [IGRA].[18] The § 8(D) requirement that the standards for the gaming facility be negotiated in a tribal-state gaming compact, proponents explain, addresses one of the many terms contemplated by IGRA.[19]

■ The Supremacy Clause [20] establishes federal law as the highest legal norm in the land and preempts conflicting or nonconforming state laws.[21] Preemption deals with congressional power to legislate to the exclusion of the states on subjects upon which Congress has the power to make law. That power is drawn from the federal constitution which limits the conferred authority to certain reserved subjects.[22] Congress adopted IGRA in 1988 to strike a balance between the rights of Indian tribes and the interests that states may have in regulating sophisticated forms of gambling.[23] Class III gaming is lawful on Indian lands *only if it is* (1) authorized by a properly approved tribal ordinance or resolution, (2) permitted by the State and (3) governed by a compact between a state and an Indian tribe.[24] "Authorized gaming",[25] as defined in IP 363, falls within

with commitments for new investment in the Gaming Facility building, its furniture, fixtures, Gaming Devices and equipment of not less than $25 million.

**16.** Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721.

**17.** For this proposition protestant cites *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).

**18.** *Supra* note 16.

**19.** The terms of 25 U.S.C. § 2710(d)(3)(C)(vi) are:

(C) Any Tribal–State compact negotiated under subparagraph (A) may include provisions relating to * * *
(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; * * *

**20.** For the pertinent terms of the Supremacy Clause, Art. 6, cl. 2, U.S. Const., see *supra* note 10.

**21.** *United States v. Home Federal S. & L. Ass'n of Tulsa*, Okl., 418 P.2d 319, 325 (1966); *Dean v. Crisp*, Okl.Cr., 536 P.2d 961, 963 (1975); *see Walker v. Maruffi*, 105 N.M. 763, 737 P.2d 544, 547 (Ct.App.1987).

**22.** The U.S. Constitution is a charter of restricted authority and delegated powers. *United States v. Darby*, 312 U.S. 100, 123–124, 61 S.Ct. 451, 462, 85 L.Ed. 609 (1941); *see also Fair School Finance Council of Oklahoma, Inc. v. State*, Okl., 746 P.2d 1135, 1149 (1987).

**23.** *See* S.Rep. 100–446, at 13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3073.

**24.** Class III gaming is lawful on Indian lands only if this activity is located in a state that "permits such gaming for any purpose by any person, organization, or entity, and ... [is] conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710(d)(1).

**25.** Section 9(A) of IP 363 defines "authorized gaming" as:

any game played with cards, dice, or any mechanical, electromechanical, or electronic or computer device or machine for money, property, checks, credit, or any representative of value, including any of the following: baccarat, big six, craps, keno, pai-gow, poker, red dog, roulette, slot machines, twenty-one, blackjack, wheel of fortune, any banking or percentage game, any electronic, mechanical, or computer device version of these games, and any other game or device approved by the Commission; provided, however, Authorized

565

Class III gaming under IGRA.[26]

■ As we view the arguments, *no preemption problem* is presented by the initiative measure under consideration here.[27] All of the issues pressed by protestant *relate to possible impacts of IP 363 on Indian tribes and on federal gaming law.* They fall into the category ranging from premature speculation to pure conjecture, dependent as they are on implementation of the measure's provisions either by the state gaming commission or by legislation. These challenges cannot be settled in advance of a tribal-state compact and of the evolved concrete facility specifications to be developed and tested against the backdrop of federal law. Protestant's constitutional challenge is both premature and nonjusticiable. It is not tendered to us on a record that would allow the issue to be decided. There is not yet an actual controversy because no compact has been offered for adversarial testing.

■ The prudential bar of restraint commands that the constitutional issues pressed today not be resolved in advance of strict necessity.[28] No necessity exists here for presubmission resolution of the constitu-

> Gaming shall not include jai alai, sports pools, dog racing, or bingo;

26. IGRA establishes three classes of gambling: Class I gaming—social or ceremonial games; Class II gaming—bingo and similar games; and Class III gaming—all other gambling, including parimutuel horse racing, casino gaming, and electronic versions of Class II games. 25 U.S.C. § 2703. It provides for a system of joint regulation of Class II gaming by tribes and the federal government and a system for compacts between Indian tribes and states for regulation of Class III gaming. 25 U.S.C. § 2710. For recent U.S. Supreme Court jurisprudence construing IGRA, see *Seminole Tribe of Florida v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

27. Because we conclude the measure in question is not facially invalid, we need not address proponents' argument that presubmission review of the content of an initiative petition is an impermissible prior restraint upon core political speech.

28. The prudential rule of necessity, adhered to by all state and federal courts, holds that constitutional issues must not be resolved in advance of strict necessity. *Smith v. Westinghouse Elec. Corp.*, Okl., 732 P.2d 466, 467 n. 3 (1987); *I.N.S. v. Chadha*, 462 U.S. 919, 936–937, 103 S.Ct. 2764, 2776–2777, 77 L.Ed.2d 317 (1983); *Ash-*

tional validity of these premature content-based challenges to the petition. Until actual implementation by the gaming commission (or legislative enactment) has been effected, the meaning of the word *scope* (in the measure) remains uncertain. To now scrutinize the outer limit of that word in terms of its impact on Indian tribes would be, at best, speculative. Moreover, there is no one before us now who has standing to challenge the measure's validity for its federal and state constitutional conformity.[29] No individual tribe has thus far been adversely impacted. We hence conclude that the measure is free from facial federal or state constitutional infirmity.

**B.**

**The Standard For Gauging Conformity Of The Proposed Initiative—A Constitutional "Amendment by Article"—To The Single–Subject Mandate of Art. 24 § 1, Okl. Const.**

■ Protestant, who argues that the proposed initiative petition violates the single-subject mandate of Art. 24 § 1, Okl. Const.,[30]

*wander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *see also Schwartz v. Diehl*, Okl., 568 P.2d 280, 283 (1977); *Dablemont v. State, Department of Public Safety*, Okl., 543 P.2d 563, 564–565 (1975).

29. The threshold criteria for standing are that (1) an actual or threatened injury (sometimes called injury-in-fact) has occurred, (2) some relief for the harm can be given, and (3) the interest to be guarded is within a statutorily or constitutionally protected zone. *Hendrick v. Walters*, Okl., 865 P.2d 1232, 1236–1237 (1993); *Independent School Dist. No. 9 of Tulsa County v. Glass*, Okl., 639 P.2d 1233, 1237 (1982). Not only is standing confined to those whose interest in the controversy is "direct, immediate and substantial," [*Underside v. Lathrop*, Okl., 645 P.2d 514, 517 (1982); *Democratic Party of Oklahoma v. Estep*, Okl., 652 P.2d 271, 274 n. 13 (1982)], but a litigant must also have a personal stake in the outcome. *Glass, supra* at 1237.

30. The pertinent terms of Art. 24, § 1, Okl. Const., are:

* * * No proposal for the amendment or alteration of this Constitution which is submitted to the voters shall embrace *more than one general subject* and the voters shall vote separately for

by encompassing more than one general subject, objects to the provisions that relate to the taxability of gaming operations, the allocation of the gaming revenue, and to the legalization of gambling-related civil liability. Although conceding that the article's various subjects "tangentially relate to casino gambling", protestant urges that these provisions are unnecessary to the objective of legalizing and regulating casino gaming. Protestant implores us to reject these provisions as a facially impermissible attempt at log rolling.

 A single-subject measure, within the meaning of Art. 24 § 1, Okl. Const.,[31] is one whose componential ingredients, no matter how numerous, are so interrelated as to all form parts of an integrated whole. The purpose of the one-general-subject criterion is to guard against deceit or against the presentation of a misleading proposal as well as to prevent log rolling—the combining of unrelated proposals.[32] *In re Initiative Petition No. 319*[33] teaches that when the proposed *constitutional amendment is by a new*

article the test for gauging multiplicity of subjects is whether the changes proposed are *all germane* to a singular common subject and purpose or are essentially unrelated one to another.[34]

When testing a proposed constitutional amendment for its components' germaneness, we look to whether each of its several facets bears a common concern or impacts one general object or subject. Gauging the measure under consideration by these criteria, we hold that the elements of taxability, distribution of gaming revenue and of civil liability for debts incurred in gaming to be authorized are *germane* to the general subject of legalization and regulation of authorized casino gambling.

### C.

### Sufficiency of the Gist

Protestant claims the petition before us is deceptive and misleading. He argues that the proposed gist statement—required by 34

---

or against each proposal submitted; provided, however, that in the submission of proposals for the *amendment of the Constitution by articles,* which embrace one general subject, *each proposed article shall be deemed a single proposal* or proposition. (Emphasis added.)

**31.** *Id.*

**32.** *Log rolling* is defined as a "legislative practice of embracing in one bill several distinct matters, none of which, perhaps, could singly obtain the assent of the legislature, and then procuring its passage by a combination of the minorities in favor of each of the measures into a majority that will adopt them all. Practice of including in one statute or constitutional amendment more than one proposition, inducing voters to vote for all, notwithstanding they might not have voted for all if amendments or statutes had been submitted separately." Black's Law Dictionary 849 (5th ed. 1979).

**33.** Okl., 682 P.2d 222, 224 (1984). In *In re Init. Pet. 319* the *germaneness* test was applied in gauging the constitutional conformity of *a proposed constitutional article* to the single-subject mandate in Art. 24, § 1, Okl. Const. The court noted that consistently with the approach suggested in *In re Initiative Petition No. 314*, Okl., 625 P.2d 595 (1980), it would apply no more restrictive a test than that approved in both *Rupe v. Shaw*, 286 P.2d 1094 (1955) and *In re Initiative Petition No. 271*, 373 P.2d 1017 (1962). In *In re Init. 319, supra,* the court observed:

[G]enerally provisions governing projects related as to constitute a single scheme may be properly included within the same amendment; and that matters *germane* to the same general subject indicated in the amendment's title, or within the field of legislation suggested thereby, may be included therein. (Emphasis added.)

*Id. at 224,* quoting from *Rupe, supra* at 1097. In *In re Init. Pet. 319, supra* at 224, the court also observed that *Rupe* included within the single-subject standard components which were incidents, "necessary or convenient or tending to the accomplishment of one general design notwithstanding other purposes than the main design may be thereby subserved." *Rupe, supra* at 1097, accorded a liberal rather than a narrow or technical construction to the single-subject requirement.

**34.** *In re Initiative Petition No. 319, supra* note 33 at 224; *In re Initiative Petition No. 271, supra* note 33 at 1019; *Rupe, supra* note 33 at 1097. *See also Campbell v. White*, Okl., 856 P.2d 255, 260 (1993), where the court reaffirms the germaneness test for determining a legislative bill's conformity to the Art. 5, § 56, Okl. Const., single-subject command. The germaneness test, as elucidated in *Legislature of State of Cal. v. Eu*, 54 Cal.3d 492, 286 Cal.Rptr. 283, 294, 816 P.2d 1309, 1320 (1991), is met when all of the parts of a measure are "reasonably germane" to each other and to "the general purpose or object" of the measure.

O.S.Supp.1992 § 3 [35] to be on each signature page of the petition—conveys by inference or implication that the measure would immediately legalize casino gaming statewide, although in fact IP 363 imposes a severe geographical restriction for the first five years. We are urged that the gist statement creates the appearance that local government would receive a portion of the tax, whereas most local governments will not realize any proceeds during the five-year moratorium after the measure's approval. According to protestant, the failure of the gist statement to mention that the measure declares gambling-related indebtedness to be subject to civil liability constitutes not only log rolling at its worst, but outright deceit as well. We disagree.

█ The terms of § 3 require that the petition contain "[a] simple statement of the gist of the proposition." [36] In contrast, 34 O.S.Supp.1994 § 9 provides that the ballot title, in no more than 150 words, explain the *effect* of the proposition. The purpose of these two statutes is to prevent *fraud, deceit* or *corruption* in the initiative process.[37]

█ The sole question presented for the court's determination is whether *the absence of a more detailed gist statement* about the phase-in aspects of the gaming facilities in the 73 counties, the distribution of casino tax revenues and the legalization of gaming-related civil liability, without more, perpetrates a fraud on the signatories. The "gist" at the top of the petition states:

> The gist of the proposition is: This measure would authorize regulated casino gaming by adding a new article to the State Constitution; the casinos would pay a 10% gaming fee to the State, which, after funding the Gaming Commission, would go: 50% to public elementary and secondary schools statewide, 25% to local governments where the casinos are located, and 25% to correctional institutions.

The flaw, if any there be, in the omission of the complained-of details is not critical to protecting the initiative process from fraud. *The measure's gist is not required to contain every regulatory detail so long as its outline is not incorrect.*[38] The text of the gist prepared in this case—required by § 3 to be in simple language—informs a signer of what the measure is generally intended to do, i.e., "authorize regulated casino gaming by adding a new article to the State Constitution". We therefore approve the text of the challenged gist statement as free from the taint of misleading terms or deceitful language.

## V

### BALLOT TITLE PROTEST

Proponents challenge several statements in the AG's ballot title.[39] According to pro-

---

**35.** The pertinent terms of 34 O.S.Supp.1992 § 3 are:

> * * * A *simple statement of the gist* of the proposition shall be printed on the top margin of each signature sheet. * * * (Emphasis added.)

**36.** For the pertinent terms of 34 O.S.Supp.1992 § 3, see *supra* note 35; *In re Initiative Petition No. 360*, Okl., 879 P.2d 810, 817 (1994).

**37.** *Community Gas and Service Co. v. Walbaum*, Okl., 404 P.2d 1014, 1016 (1965).

**38.** *In re Initiative Petition No. 360, supra* note 36 at 817.

**39.** The A.G.'s substitute ballot title states:

> BALLOT TITLE
> This measure adds a new Article to the Oklahoma Constitution. The new Article deals with gambling. The new Article legalizes:
> a. Slot machines and roulette,
> b. Craps, keno and video gambling,
> c. All gambling played with cards, dice, mechanical devices or computers, and
> d. Other forms of gambling.
> For the first five years there could only be four non-Indian gambling facilities. Those facilities are:
> 1. Remington Park Racetrack,
> 2. Blue Ribbon Downs Racetrack,
> 3. A facility in Tulsa, and
> 4. A facility in Love County.
> An appointed Commission would regulate and license this gambling. After five years, other gambling facilities could be licensed. There could not be more than one facility in any county. Gambling facilities would have to meet minimum standards.
> The measure opens the door for Indian tribes to engage in the new forms of gambling. State limits and standards would have limited or no effect on Indian gambling. The State could not tax Indian gambling.
> The measure makes gambling debts legal and enforceable.

ponents, the substitute text is deceptive, biased, misleading and misstates the measure's effect. They urge this court to reject the AG's substitute and adopt *their version* that is included in the initiative measure.[40] The requirements for ballot titles are set forth in 34 O.S.Supp.1994 § 9(B).[41] Their text must explain in basic words the effect of the proposition. The language used must neither (a) "have a specialized meaning to a particular trade or profession not commonly known to the citizens" nor (b) "reflect partiality in its composition or contain any argument for or against the measure."[42] When a prepared ballot title does not satisfy the § 9(B) requirements, this court is authorized by the

> State taxes on the new gambling would fund the Commission, and help education and prisons. Some tax funds would go to local governments where State licensed gambling is conducted.
> SHALL THIS PROPOSAL BE APPROVED BY THE PEOPLE?
> ———— Yes, for the Proposal.
> ———— No, against the Proposal

**40.** Proponents' ballot title states:

> This measure would change the State Constitution to permit casino gaming.
> At first, there could be four casinos. Two casinos could be at licensed horse racing tracks running more than 500 betting days in any five year period. Another casino could be in Tulsa's arts and entertainment tax increment district. The fourth casino could be in Love County. Five years after the first casino opens, there could be other casinos by county option elections. Only one casino per county would be allowed. At least $25,000,000 would have to be invested in each casino.
> A seven member Commission would regulate the casino business. The Governor and Legislative leaders would appoint the first members for one to three year terms. The Governor would appoint later members with the Senate's advice and consent. The Commission could borrow money for its first budget. Fees paid by casinos and related businesses would fund later Commission budgets.
> Each casino would pay a 10% fee on its total winnings to the State. After funding the Commission's budget, 50% of the fee would go to public grade schools and high schools statewide. 25% would go to prisons. 25% would go to local governments where casinos are located.
> SHALL THE PROPOSED CONSTITUTIONAL AMENDMENT BE APPROVED?
> ( ) YES—FOR THE AMENDMENT
> ( ) NO—AGAINST THE AMENDMENT.

**41.** The terms of 34 O.S.Supp.1994 § 9(B) are:

provisions of 34 O.S.1991 § 10(A)[43] to correct it.[44]

### A.

### Misleading Statements In the Ballot Title

■ Proponents contend the AG's substitute ballot title is *argumentative* and *biased* because it impermissibly speculates on the possible *consequences*, rather than the *effect*, of the proposed measure's passage. They urge that some language in the AG's ballot title that pertains to the measure's effect on Indian gaming misstates the law. Proponents direct us to two sentences in the fourth paragraph of that title:

> B. The parties submitting the measure shall also submit a suggested ballot title which shall be filed on a separate sheet of paper and shall not be deemed part of the petition. The suggested ballot title:
> 1. Shall not exceed two hundred (200) words;
> 2. Shall explain in basic words, which can be easily found in dictionaries of general usage, the *effect of the proposition;*
> 3. Shall be written on the *eighth-grade reading comprehension level;*
> 4. *Shall not contain any words* which have a special meaning for a particular profession or trade *not commonly known* to the citizens of this state;
> 5. Shall not reflect partiality in its composition or contain any argument for or against the measure;
> 6. Shall contain language which clearly states that a "yes" vote is a vote in favor of the proposition and a "no" vote is a vote against the proposition; and
> 7. Shall not contain language whereby a "yes" vote is, in fact, a vote against the proposition and a "no" vote is, in fact, a vote in favor of the proposition. (Emphasis added.)

**42.** 34 O.S.Supp.1994 § 9(B)(4) and (5), *supra* note 41.

**43.** The terms of 34 O.S.1991 § 10(A) provide:
> A. Any person who is dissatisfied with the wording of a ballot title may, within ten (10) days after the same is filed by the Attorney General with the Secretary of State as provided for in Section 9 of this title, appeal to the Supreme Court by petition in which shall be offered a substitute ballot title for the one from which the appeal is taken. Upon the hearing of such appeal, the *court may correct or amend the ballot title* before the court, or accept the substitute suggested, or may draft a new one which will conform to the provisions of Section 9 of this title. (Emphasis added.)

**44.** *In re Initiative Petition No. 362,* Okl., 899 P.2d 1145, 1148–1149 (1995).

The measure opens the door for Indian tribes to engage in the new forms of gambling. State limits and standards would have limited or no effect on Indian gambling.

**(1) *"The measure opens the door for Indian tribes to engage in the new forms of gambling."***

Proponents argue the statement "the measure opens the door for Indian tribes to engage in the new forms of gambling" is a *consequence* of the measure *rather than its effect.*

The AG counters that IGRA allows Indian tribes to engage in Class III gaming only in a state which permits that form of gambling. If IP 363 is approved by the voters, the AG points out, the State, upon request, will be required to negotiate in good faith to enter into a tribal-state compact. Failure to mention this *major effect* of the measure, the AG urges, would mislead the voters into believing that casino gaming could only take place at state licensed facilities.

We agree that the negotiability of tribal-state gaming compacts is indeed a legal effect of the measure's adoption. Class III gaming on Indian land ("authorized gaming" under IP 363) is made lawful only in those states which permit that form of gambling within their borders. Because the quoted text may mislead the voter into believing that "opening the doors" is akin to "opening the floodgates", that sentence is amended as follows:

"The measure would allow Indian tribes to request an agreement to operate a gambling casino."

**(2) *"State limits and standards would have limited or no effect on Indian gambling."***

■ Proponents argue that the quoted text in the AG's ballot title is deceptive and misleading because it misstates the effect of IP 363 by implying that Indian-run casinos will not be subject to state standards and other regulations. They claim that this sentence *is merely a possible consequence of the*

measure's adoption, not its effect. According to proponents, the proposed measure requires that Indian-run casino gambling be subject to the same regulations as all other forms of authorized casino gambling. The legalization of casino gambling in the State, proponents urge, will not "automatically allow tribes to force" the State into negotiations for a tribal-state compact. They direct us to recent U.S. Supreme Court jurisprudence, *Seminole Tribe of Florida v. Florida,*[45] which teaches that tribes cannot sue states to compel negotiation of a tribal-state compact.

Because the state-law effect on Class III gaming depends upon the negotiated compact between the State and the respective tribal government, the AG's failure to explain this correlation in the ballot title may mislead voters into believing that casino gambling on Indian land will be an unregulated activity. We must accordingly delete two sentences as unnecessary and perhaps misleading:

"State limits and standards would have limited or no effect on Indian gambling. The State could not tax Indian gambling."

**B.**

**Legalizing Gambling Debts**

■ Proponents object to the ballot title's statement that the "measure makes gambling debts legal and enforceable." They argue that reference to the legalization of gambling debts is inaccurate and biased. They concede that gaming debts incurred at *authorized casinos would be* civilly enforceable, but disagree that this applies to *all* gambling debts. According to proponents, the AG's ballot title *will mislead the voters to reach an erroneous conclusion.*

The AG, who counters that IP 363 not only legalizes new forms of gambling, but also a person's "going into debt to gamble," argues that nowhere does the ballot title state that all gambling debts are legally enforceable.

We hold that the objectionable text of the AG's ballot title is indeed overly broad and could lead voters to believe that gambling debts other than those authorized by the proposed measure would be made legal and enforceable. The deficiency is corrected by

45. —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

adding four words to the AG's ballot title statement to provide:

"The measure makes gambling debts incurred at authorized casinos legal and enforceable."

## C.

### Bias In The Ballot Title—
### *Gaming v. Gambling*

Proponents object to the AG's use (in the ballot title) of the word "gambling" instead of "gaming". They argue the former has a more technical and biased meaning in that it evokes "images of illegal betting in smoke filled rooms accessible only by alleyways". The measure, they urge, proposes for submission the legalization of intensely regulated "casino gaming," rather than the "back alley" type of gambling. We disagree.

■ Recognized constitutional hermeneutics dictates that fundamental-law provisions be interpreted in conformity with their *ordinary* significance in the English language, *i.e.,* that they be given their *commonly accepted* and *nontechnical* meaning. Fundamental-law provisions *must be construed in a practical manner in order to honor the plainly manifested intent of their drafters.*[46]

■ We note that the word "gaming" is the proper term when dealing with federal Indian gaming legislation—i.e., IGRA Class III gaming.[47] According to evolving academic legal classification,[48] "gaming" correctly describes certain kinds of "casino-style" gambling.[49] Should IP 363 be adopted, "gaming" will be a proper term when this court is later called upon to construe the new constitutional article. Although the latter term, as defined in IP 363, appears to be the approved parlance of the developing legal systematics in the U.S., it has not yet been accommodated by Oklahoma's own legal system. We must remain faithful to the legislative command by making the language of ballot titles intelligible for people whose understanding accords with an eighth-grade educational level.[50] For them, we believe, the word "gambling" has a fixed meaning while "gaming" might be misunderstood. In the ordinary parlance, *"gambling"* is a generic word for all games of hazard.[51] Although the term *"gaming"* has a more restricted meaning in the classification given by recent jurisprudence and the evolving systematics of the textwriters, both terms—gaming and gambling—have long been deemed synonymous with "games of hazard or skills".[52]

In light of these terms' history, considered with the legislative mandate for simplicity, we cannot conclude that the AG's use of "gambling" instead of "gaming" (in the text

46. *Ogden v. Hunt,* Okl., 286 P.2d 1088 syl. 1, 2 (1955); *Sharpe v. State ex rel. Oklahoma Bar Association,* Okl., 448 P.2d 301, 306 (1968); *Wade v. Brown,* Okl., 516 P.2d 526, 528 (1973); *Campbell v. White,* Okl., 856 P.2d 255, 262 (1993).

47. *See* the three classifications of "gaming" under IGRA, 25 U.S.C. § 2703, *supra* note 26.

48. G. Robert Blakey, Gaming, Lotteries, and Wagering: The pre-Revolutionary Roots of the Law of Gambling, 16 Rutgers L.J. 211, 214 n. 8 (1985). "The three key forms of gambling are gaming, lotteries and betting. Gaming may be defined as 'the playing of any game for stakes hazarded by the players.' A lottery may be defined as 'a distribution of prizes by lot or chance.' Betting may be defined as 'promise[s] to give money or money's worth upon the determination of an uncertain or unascertained event in a particular way, and (unlike a lottery) may involve skill or judgment.' " *Id.* at 214 n. 8, quoting from Royal Comm'n on Lotteries and Betting 1932–33, Final Report, Cmd.

49. Mike Roberts, The Constitutionality of Gaming in Tennessee, 61 Tenn. L.Rev. 675, 685 (1994); *Blakey, supra* note 48.

50. *See* 34 O.S.Supp.1994 § 9(B)(3), *supra* note 41.

51. The term *"gambling"* (or *"to gamble"*) is defined as (1) "to play games of chance for money; to stake money on some chance," THE SHORTER OXFORD ENGLISH DICTIONARY at 772 (Vol. 1) (1936); (2) to "play games of chance for high stakes," THE OXFORD DICTIONARY OF ENGLISH ETYMOLOGY at 388 (1966); (3) "practice or business of playing games for money," A DICTIONARY OF AMERICAN ENGLISH at 1094 (Vol. 2) (1940).

52. The term *"gaming"* is defined as (1) as the "action or habit of playing a game of chance for stakes; gambling," THE OXFORD ENGLISH DICTIONARY at 342 (Vol. 6) (2d Ed 1989); (2) "playing of games of chance for money or winnings," A DICTIONARY OF AMERICAN ENGLISH at 1096 (Vol. II) (1940); (3) *"Gambling* ... the celebration of games," THE SHORTER OXFORD ENGLISH DICTIONARY at 773 (Vol. I) (1936). For the definition of *gambling,* see *supra* note 51.

prepared for the ballot title) is clearly contrary to the command of statutory law.

## SUMMARY

Protestant's challenges to the constitutional validity of the initiative measure—based on its alleged restrictive impact on Class III gaming on Indian land—are premature and presently nonjusticiable. Assessment of the measure's impact on tribal Class III gaming and on tribal gaming facilities must await (a) implementation of the proposed measure by state gaming commission rules and procedures as well as by legislation, (b) the existence of a negotiated tribal-state compact with concrete facility specifications and (c) be viewed against the backdrop of federal law (IGRA). Absent these components, it is, at best, premature to scrutinize the outer limit of the measure's terms vis-a-vis tribal gaming on Indian land.

The proposed constitutional "amendment by article" is tested by the standard of germaneness for its constitutional conformity to the Art. 24, § 1 single-subject mandate. The taxability and distribution of gaming revenue and the legalization of gaming-related civil liability are germane to the legalization, regulation and enforcement of authorized casino gambling.

The petition's gist statement—which is to be tested by whether an omission of detail will result in fraud or deceit—sufficiently and accurately informs the signer of the measure's intended purpose—i.e., to authorize and regulate casino gaming by the addition of a new constitutional article.

Four statements in the AG's substitute ballot title are held deficient or overly broad. Two of them must *be amended* and the remaining *two deleted* to avoid the taint of misleading the voters as to (a) the measure's effect on tribal gaming and (b) what gambling debts will be legalized by the measure's terms.[53]

In ordinary parlance people consider all games of hazard to be accommodated more fittingly by the term *"gambling"* than by the word *"gaming"*. Because constitutional provisions must be interpreted in conformity with their ordinary significance in the common English parlance, the AG's use (in the prepared ballot title) of the word "gambling" is not contrary to the command of our statutory law.

**INITIATIVE PETITION NO. 363 IS HELD LEGALLY SUFFICIENT FOR SUBMISSION TO THE PEOPLE OF OKLAHOMA; THE TEXT OF THE BALLOT TITLE PREPARED BY THE ATTORNEY GENERAL DECLARED LEGALLY DEFICIENT IN PART AND AMENDED.**

WILSON, C.J., and HODGES, LAVENDER, SIMMS, HARGRAVE and WATT, JJ., concur.

KAUGER, V.C.J., and SUMMERS, J., concur in result.

53. The *amended* AG's substitute ballot title provides:
BALLOT TITLE
This measure adds a new Article to the Oklahoma Constitution. The new Article deals with gambling. The new Article legalizes:
 a. Slot machines and roulette,
 b. Craps, keno and video gambling,
 c. All gambling played with cards, dice, mechanical devices or computers, and
 d. Other forms of gambling.
For the first five years there could only be four non-Indian gambling facilities. Those facilities are:
 1. Remington Park Racetrack,
 2. Blue Ribbon Downs Racetrack,
 3. A facility in Tulsa, and
 4. A facility in Love County.
An appointed Commission would regulate and license this gambling. After five years, other gambling facilities could be licensed. There could not be more than one facility in any county. Gambling facilities would have to meet minimum standards.
The measure would allow Indian tribes to request an agreement to operate a gambling casino.
The measure makes gambling debts incurred at authorized casinos legal and enforceable. State taxes on the new gambling would fund the Commission, and help education and prisons. Some tax funds would go to local governments where State licensed gambling is conducted.
SHALL THIS PROPOSAL BE APPROVED BY THE PEOPLE?
_____ Yes, for the Proposal.
_____ No, against the Proposal