Dear Senate Muegge:
¶ 0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:
 1. Under the Oklahoma Concentrated Animal Feeding Operations Act, 2 O.S. 1991 and Supp. 1999, §§ 9-200-9-215, do any provisions of law require the Department of Agriculture to afford notification or an administrative hearing to "affected property owners," as that term is defined in the Act, in connection with an application for the renewal of a license to operate a Concentrated Animal Feeding Operation?
 2. If the answer to the first question is yes, when is notification or a hearing required?
 I. Introduction
¶ 1 The Oklahoma Concentrated Animal Feeding Operations Act ("Act"), 2 O.S. 1991 and Supp. 1999, §§ 9-200-9-215, was enacted "to provide for environmentally responsible construction and expansion of animal feeding operations and to protect the safety, welfare and quality of life of persons who live in the vicinity of an animal feeding operation." 2 O.S. Supp. 1999, §9-201[2-9-201](B). You ask about Concentrated Animal Feeding Operations ("CAFO"). That term is generally defined as either (a) licensed managed feeding operations;[1] (b) animal feeding operations which discharge pollutants into waters of the State and contain more than a specified number of animals, depending on the species of the animal; or (c) animal feeding operations which discharge pollutants into waters of the State through an artificially constructed device or discharge pollutants directly into navigable waters which pass through a facility, and contain more than a specified number of various species of animals. See2 O.S. Supp. 1999, § 9-202[2-9-202](B)(11). There is also a fourth category: An operation is a CAFO if the State Board of Agriculture ("Board" or "Department") determines that the operation is a "significant contributor of pollution to waters of the state" under the Act. Id. § 9-202(B)(11)(d).
¶ 2 Each CAFO is required to be licensed under the Act. See2 O.S. Supp. 1999, § 9-204.1[2-9-204.1](A)(1). Those interested in obtaining an initial license must provide both public notice to allow comment on the proposed license (see 2 O.S. Supp. 1999,§ 9-205.1[2-9-205.1](D)), and individual notice to "affected property owners."[2] See 2 O.S. Supp. 1999, § 9-205.1[2-9-205.1](C)(1). Any affected property owner can submit a written request for a hearing, setting forth specific allegations. See id. § 9-205.1(C)(2). If such a hearing is requested, the Department is required to hold an administrative hearing within a certain amount of time. See id. § 9-205.1(C)(3). The hearing must be held in accordance with Article II of the Administrative Procedures Act, codified at 75 O.S. 1991 and Supp. 1999, §§308a-323. See 2 O.S. Supp. 1999, § 9-205.1[2-9-205.1](C)(5).
¶ 3 You first ask if any provision in the Act requires the Department to give notice or an administrative hearing to "affected property owners" when a CAFO license comes up for renewal. Essentially, you wish to know if affected property owners have standing to contest a renewal.
¶ 4 To have standing, a party "must show (1) actual or threatened injury, (2) for which relief can be given, and (3) the interest to be protected is `within a statutorily or constitutionally protected zone.'" Brandon v. Ashworth,955 P.2d 233, 235 (Okla. 1998) (quoting In re Initiative PetitionNo. 363, 927 P.2d 558, 565 n. 29 (Okla. 1996)). The interest must be "direct, immediate and substantial." Id. at 235 (quoting Underside v. Lathrop, 645 P.2d 514, 517 (Okla. 1982)). See also Cities Service Co. v. Gulf Oil Corp.,976 P.2d 545, 547 (Okla. 1999) (listing elements as "(1) a legallyprotected interest which must have been injured in fact —i.e., an injury which is actual, concrete and not conjectural
in nature, (2) a causal nexus between the injury and the complained of conduct, and (3) a likelihood, as opposed to merespeculation, that the injury will be redressed by a favorabledecision."Id. (emphasis in bold added) (citing Toxic WasteImpact Group, Inc. v. Leavitt, 890 P.2d 906 (1994)).
¶ 5 The factor upon which we must focus is whether an adjacent property owner's interest to be protected is "within a statutorily or constitutionally protected zone." To ascertain this, we will first look at the statute.
 II. The Act
¶ 6 The Act provides that licenses may be renewed yearly upon a showing that the renewal fee has been paid and that all provisions of the Act have been complied with. See 2 O.S.Supp. 1999, § 9-209[2-9-209](A). The Department's Rules provide for renewal deadlines. See OAC 35:17-3-8(a) (1999). A renewal shall be issued "unless sufficient cause to terminate or revoke the license is shown." OAC 35:17-3-8(b)(1) (1999).
¶ 7 Neither the Rules nor the Act specifically sets forth a procedure for showing "sufficient cause"; however, the Rules contain a provision dealing with the procedure for filing complaints. This section provides that a complaint must be in writing; that the Department must acknowledge receipt of the complaint within five working days; that the party against whom the complaint was filed must also be notified within five working days; and that the resolution of the complaint "is the completion of the appropriate administrative, jurisdictional, and legal remedies to the extent possible by the Department." OAC35:17-3-23 (1999). Both the complainant and owner must be notified in writing within seven days after the complaint has been resolved. See id.
¶ 8 Section 9-211 of the Act, which deals with denial, suspension or revocation of a license, directs the Department to establish a "violation points system," under which points are assigned for various violations of the Act. This system contemplates that there will be a greater penalty for "violations which are intentional and for violations which pose a greater threat to the environment." 2 O.S. Supp. 1999, § 9-211[2-9-211](A)(1). The Act further provides that the Department has "the power to suspend, revoke or not renew the license of any animal feeding operation based on such point system after a hearing, and after an administrative determination" that an operation has "violated or has failed to comply" with provisions of the Act, or a rule promulgated pursuant to the Act. See id. § 9-211(A)(2) (emphasis added). The Department has promulgated a rule which provides that if any animal feeding operation accrues "a total of fifteen (15) or more points in any two (2) year time period, the license of the animal feeding operation shall be suspended, revoked, or not renewed." OAC 35:17-3-22(1) (1999). The Rule provides that, in the more serious infractions (those which command assessment of either four or five points, the maximum for a single violation), points cannot accrue unless the Board of Agriculture approves the assessment; all other point assessments accrue upon the approval of the Water Quality Services Division of the Department. See OAC 35:17-3-22(3) (1999). Assessment of these points can be appealed. If the total of accumulated points reaches 15, the owner can appeal to the Board. See id.
¶ 9 There is one other procedure which, although not technically a "renewal," does touch upon your question. The Act provides that "expanding operations" are required to seek a new license before such expansion can take place. See 2 O.S. Supp.1999, § 9-204.1[2-9-204.1](C). "Expanding operation" means either:
 a. [A] facility that either increases its animal unit capacity to a number that causes the facility to initially meet the definition of a licensed managed feeding operation, or
 b. a licensed managed feeding operation that seeks to increase its licensed capacity in excess of five percent (5%) of the original facility's licensed capacity[.]
Id. § 9-202(B)(14).
¶ 10 However, unless the increase in animal unit capacity exceeds five percent, a change in species or ratio of species mix does not constitute an expanding operation. Additionally, a facility "shall only be deemed an expanding operation if an increase in animal unit capacity involves construction of facilities, including waste retention structures or barns." OAC35:17-3-5.1(a) (1999). When a license as an expanding operation is sought, individual notice is required to be given to all affected property owners (see OAC 35:17-3-7(a) (1999)), as well as publication of the notice in a newspaper of general circulation in the county where the operation is located. See
OAC 35:17-3-7(b) (1999). Therefore, affected property owners are afforded notice and an opportunity to request a hearing if an operator seeks an expanding application.
¶ 11 As the above provisions show, there is nothing in the Act specifically requiring anyone to be notified when an operator seeks to renew the license, nor is there an opportunity for a hearing absent these provisions. If a complaint has been received and a hearing is to be held during the period a CAFO is operating, there are provisions providing that complainants be notified. However, there is nothing in such event mandating that any person other than the complainants be notified. Therefore, unless by happenstance the complainants notified of a hearing also happen to be affected property owners, the Act does not specifically require that affected property owners be notified.
 III. Constitutional Considerations
¶ 12 But that does not end the question. Implicit in your question is whether there are any constitutional considerations involved in a normal renewal process under the Act.
a. Scope of constitutional remedies.
¶ 13 The Fourteenth Amendment to the United States Constitution and Article II, § 7 of the Oklahoma Constitution prohibit the State from depriving a person of life, liberty, or property without Due Process of law. The inquiry here is whether the granting of a license renewal without notice to adjacent land owners or without an opportunity for them to object infringes or implicates a property interest within the meaning of the Due Process Clause. The United States Supreme Court has made it clear this is not an unlimited field. In Meachum v. Fano,427 U.S. 215, 223-24 (1976), the Court was faced with a Due Process challenge from an inmate who claimed a prison system's transferring him from one facility to another constituted a violation of his Due Process rights. In finding no merit to his claim, the Court "reject[ed] at the outset the notion that any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause."Id. at 224. Earlier, the Court had stated that "the range of interests protected by procedural due process is not infinite."Board of Regents v. Roth, 408 U.S. 564, 570 (1972). Furthermore,
¶ 14 Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in Goldberg v. Kelly,[397 U.S. 254 (1970)] . . ., had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.
Roth, 408 U.S. at 577.
¶ 15 The United States Supreme Court has determined that Due Process is "flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer,408 U.S. 471, 481 (1972). There are three factors to consider in determining the scope of Due Process protections:
 First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Mathews v. Eldridge, 424 U.S. 319, 335 (1976).
b. Oklahoma law.
¶ 16 We begin with reference to a provision of the Oklahoma Constitution:
 No private property shall be taken or damaged for private use, with or without compensation, unless by consent of the owner, except for private ways of necessity, or for drains and ditches across lands of others for agricultural, mining, or sanitary purposes, in such manner as may be prescribed by law.
Okla. Const. art. II, § 23. This constitutional provision gives the same protection against one's property being damaged as it does concerning one's property being taken. See Binding-StevensSeed Co. v. Local Bldg. Loan Ass'n, 45 P.2d 132, 133 (Okla. 1935). However, this section does not by itself provide the answer. Although this provision helps to protect one's property, it "do[es] not have the effect of segregating and isolating each owner's property into an utterly inviolable sphere around which others must live in a state of absolute peril." Larkins-WarrTrust v. Watchorn Petroleum Co., 174 P.2d 589, 593 (Okla. 1946).
¶ 17 Two Oklahoma cases which dealt with issuance of landfill permits are illustrative of Due Process rights of nearby property owners which must be observed during the initial licensing process.
¶ 18 In Stewart v. Rood, 796 P.2d 321 (Okla. 1990),overruled in pertinent part by DuLaney v. Oklahoma StateDepartment of Health, 868 P.2d 676 (Okla. 1993), the Oklahoma Supreme Court held that neither the Oklahoma Solid Waste Management Act nor the Oklahoma Administrative Procedures Act required an individual proceeding be conducted prior to the issuance of a landfill permit. The Court thus concluded there was no statutory requirement that adjacent landowners who claim that the issuance of a landfill permit would adversely affect their property be afforded a hearing prior to the issuance of a permit. The Court also decided that the constitutional principles of Due Process did not require that adjacent landowners be afforded notice and a hearing prior to the issuance of the landfill permit, as the landowners' claimed deprivation of property rights were at best speculative.
¶ 19 However, in DuLaney v. Oklahoma State Department ofHealth, 868 P.2d 676 (Okla. 1993), the Court partly overruled its holding in Stewart. In DuLaney, the Court concluded that, based on evidence supporting specific allegations of harm, the rights of adjacent property owners would be adversely affected; therefore, under constitutional Due Process principles embodied in both federal and state constitutions, adjacent landowners were entitled to notice and a hearing prior to the issuance of the landfill permit. The allegations tended to show that issuance of the landfill permit would, among other things, potentially involve air pollution, odor, traffic and safety problems, and underground water pollution — including pollution of groundwater used by the landowners. See id. at 680.
¶ 20 In reaching its conclusion, the Court articulated when minimum Due Process is required:
 Minimum standards of due process require that administrative proceedings, which may directly and adversely affect legally protected interests, be preceded by notice calculated to provide knowledge of the exercise of adjudicative power and an opportunity to be heard.
Id. (emphasis added).
¶ 21 In applying this standard, the Court observed that, as a matter of constitutional law, adjacent landowners must be afforded notice and an opportunity to be heard prior to the issuance of the landfill permit. The Court thus overruled its prior holding in Stewart.[3] The Court then concluded that "notice and an opportunity for a hearing must be afforded to citizenry whose health, property use, and drinking water may be affected by the location of a landfill site." Id. at 683 (citing Brown's Ferry Waste Disposal Ctr. v. Trent,611 So.2d 226 (Ala. 1992)).
¶ 22 As we observed in Attorney General Opinion No. 96-76:
 DuLaney and Stewart . . . support the following general principles of law. First, unless either required by (1) statute or (2) due process constitutional principles, the issuance of a permit or license by the State, does not require that the State afford notice and conduct an individual proceeding.
 Second, a due process hearing and accompanying notice is only necessary where the issuance of the permit or license by the State would have a direct, substantial and immediate [e]ffect upon legal or property rights of others. Stewart v. Rood, 796 P.2d 321, 333 (Okla. 1990). Also see DuLaney v. Oklahoma State Department of Health, 868 P.2d 676, 683 (Okla. 1993) ("Our conviction that adjacent landowners whose property may be substantially affected by the installation of a landfill site have a due process right to notice and an opportunity to be heard is supported by statutory enactments ignored by the Stewart Court.").
 Third, a landowner's property rights include the right to lateral and subjacent support and water rights. DuLaney, 868 P.2d at 684. The DuLaney
opinion also points out that, at least to some extent, a landowner's property rights also include the right to be free from harmful air contamination and odors, property devaluation and safety hazards. Id. at 682. Thus, substantial, direct and immediate harm to such rights brought about by the issuance of a license or permit by the State require that the affected landowners be afford[ed] notice and an opportunity to protest the issuance of the permit or license.
 Applying these principles to the issuance of a feed yard license, under the Oklahoma Feed Yards Act, 2 O.S. 1991 and Supp. 1995, §§ 9-201 through 9-212 ("the Act"), we conclude that issuance of such a license must be preceded by notice and an opportunity to be heard when the written comments received by local landowners under the procedures established under the Act contain specific factual allegations of direct, substantial and immediate harm to their legal or property rights.
. . . .
 This notification ensures that all adjacent landowners, as well as other landowners, if any, within the immediate vicinity, are notified of an applicant for a permit and given an opportunity to provide written comments. Under the principles applied in DuLaney, when those written comments contain specific factual allegations that the issuance of the permit may result in direct, substantial and immediate harm to the property or legal rights of other landowners, the Board must conduct an individual [proceeding, preceded] by proper notice, prior to the issuance of the requested feed yard license.
A.G. Opin. 96-76 at 175-76 (footnote omitted).
¶ 23 Here, as with the initial issuance of a permit, giving adjacent property owners notice and an opportunity to present evidence of direct, immediate and substantial harm is consistent with the due process dictates enunciated in Mathews, and is consistent with Okla. Const. art. II, § 23, which prohibits damage to private property by other private entities. Such a process allowing adjacent property owners to make specific allegations of direct harm done to their property by CAFOs will reduce the risks of erroneous deprivation of any property rights of these adjacent owners.
 IV. Scope of Hearing
¶ 24 We have determined that an adjacent property owner has a property interest which is protected by due process. Therefore, if the owner can also show an actual or threatened injury, for which relief can be given (see Brandon, 955 P.2d at 235), he or she has standing, and can request a hearing on the renewal application.
¶ 25 However, there must be limits to these due process rights. The requirement of notice is different here than it would be during an initial application. Unlike an initial application for a license, which can be made at any time, the Act specifically states that all licenses expire on June 30 of each year. See 2O.S. Supp. 1999, § 9-209[2-9-209](A). Therefore, adjacent property owners are charged with having constructive notice of the expiration date, and no further notice is required. See 25 O.S. 1991, §12[25-12]; Bushert v. Hughes, 912 P.2d 334, 343 n. 2 (Okla. 1996).
¶ 26 There is also the issue of what can trigger a hearing on the renewal of a CAFO license. To be entitled to a hearing, a property owner must request a hearing and present specific factual allegations showing that the continued operation of the CAFO may have a direct, substantial and immediate effect on his or her property or other legal interest. See A.G. Opin. 96-76 at 177. At the hearing, he or she must go further and present evidence sufficient to support his or her claim that the permit should be denied.
¶ 27 The issues raised in the protests must be new or be founded on new evidence. Protestants do not have a due process right to relitigate issues that they have raised in earlier protests. See Baldwin v. Iowa State Traveling Men's Ass'n,283 U.S. 522, 524 (1931) ("[T]here is involved in [the due process] doctrine no right to litigate the same question twice."). Protestants would thus be required to show either that a problem with the CAFO or its operations which was only speculative during the initial license application had become a reality or that a previously unanticipated problem had manifested itself. Such new evidence is required. An adjacent property owner is prohibited from merely reasserting at the renewal stage the same allegations asserted during the initial licensure application stage. SeeDeloney By and Through Deloney v. Downey, 944 P.2d 312, 318
(Okla. 1997) (discussing doctrines of claim preclusion (res judicata) and issue preclusion (collateral estoppel)).
¶ 28 In summary, then, under the Act, 2 O.S. 1991 and Supp.1999, §§ 9-200-9-215, we conclude that a renewal of a CAFO license must be preceded by notice and an opportunity to be heard when the written comments received from local landowners under the procedures established under the Act contain specific factual allegations of non-compliance that tends to establish direct, substantial and immediate harm to the legal or property rights of adjacent property owners.
 V. Conclusion
¶ 29 After examining the Act, 2 O.S. 1991 and Supp. 1999, §§9-200-9-215, we conclude the Act does not grant nearby property owners a statutory right to a hearing on the renewal of a CAFO license. However, Due Process considerations of notice and opportunity to be heard require that when written comments received from local landowners contain specific factual allegations that tend to establish direct, substantial and immediate harm to their legal or property rights, those landowners must be given a hearing.
¶ 30 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. Although the State Board of Agriculture need not conduct a hearing prior to the renewal of every Concentrated Animal Feeding Operation license, the Board must, pursuant to the Due Process clauses of the state and federal constitutions, conduct a hearing — an individualized proceeding under the Administrative Procedures Act, 75 O.S. 1991 and Supp. 1999, §§ 308a-323 — when nearby landowners present specific factual allegations showing that the proposed renewal of the license may have a direct, substantial and immediate effect on their property or legal interests. See Okla. Const. art. II, §§ 7, 23; DuLaney v. Oklahoma State Dep't of Health, 868 P.2d 676, 683 (Okla. 1993).
 2. Under the Oklahoma Concentrated Animal Feeding Operations Act, all CAFO licenses must be renewed by June 30 of every year. Adjacent property owners wishing to present evidence showing that a CAFO license should not be renewed are charged with having constructive notice of this date. No further notice is required. See 2 O.S. Supp. 1999, § 9-209(A); 25 O.S. 1991, § 12[25-12]; Bushert v. Hughes, 912 P.2d 334, 343 n. 2 (Okla. 1996).
 3. Absent new evidence, an adjacent property owner has no Due Process right to litigate issues at the renewal stage which were litigated at the initial licensure stage under the Oklahoma Concentrated Animal Feeding Operations Act, 2 O.S. 1991 and Supp. 1999, §§ 9-200-9-215.
 W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
 DAN CONNALLY ASSISTANT ATTORNEY GENERAL
[1] That term is generally defined as an "animal feeding operation primarily using a liquid animal waste management system, where animals are primarily housed in a roof-covered structure and which has more than the number of animals specified" in the definition. 2 O.S. Supp. 1999, § 9-202[2-9-202](B)(18). The number of animals varies, depending on species. An "animal feeding operation" is generally defined as "a lot or facility" where animals are confined and fed for 90 consecutive days or more in any twelve-month period, and vegetation has not been sustained over any portion of the facility. See id. § 9-202(B)(2).
[2] The phrase "affected property owners" is defined as
[A] surface landowner within:
 a. one (1) mile of the designated perimeter of an animal feeding operation which:
 (1) does not meet the definition of a licensed managed feeding operation, or
 (2) is previously unlicensed or an expanding licensed managed feeding operation with a capacity of two thousand (2,000) or less animal units, or
 b. two (2) miles of the designated perimeter of a licensed managed feeding operation or an expanding operation with a capacity of more than two thousand (2,000) animal units for which a license is being sought[.]
2 O.S. Supp. 1999, § 2-902[2-2-902](B)(1).
[3] The DuLaney Court's language makes clear it was only overruling the portions of Stewart which held that adjacent landowners had no constitutional interest which required notice and an opportunity to be heard before the issuance of a landfill permit. This conclusion was based on the adjacent landowners' specific allegations of harm. The adjacent landowners inDuLaney had specifically alleged harm, which in the Court's words:
 [C]annot be corrected either by the arrest or suppression of the offending party or by the application of a coat of paint. Their concerns include the potential for harmful contaminates in both the air and in ground water underlying their property, odor, property devaluation, and safety hazards — all arising from the landfill site.
DuLaney, 868 P.2d at 682.