2014 OK 23

In re INITIATIVE PETITION NO. 397, STATE QUESTION NO. 767,

Take Shelter Oklahoma and Kristi Conatzer, Petitioners,

v.

State of Oklahoma, ex rel., Attorney General, E. Scott Pruitt, Respondent.

No. 112264.

Supreme Court of Oklahoma.

April 1, 2014.

Rehearing Denied April 21, 2014.

David R. Slane and Richard Morrissette, Oklahoma City, for Co–Petitioners/Proponents, Take Shelter Oklahoma, Kristi Conatzer.

Neal Leader, Senior Assistant Attorney General and Charles S. Rogers, Senior Assistant Attorney General, Oklahoma City, for Respondent State of Oklahoma, ex rel Attorney General E. Scott Pruitt.

EDMONDSON, J.

¶ 1 On Sept. 18, 2013, Initiative Petition No. 397, State Question 767 was filed with Secretary of State. The Initiative Petition

proposes amendments to the State Constitution with an ultimate primary purpose of constructing storm shelters for schools. Proponents also filed with the Secretary of State a proposed ballot title for their proposed Initiative.

¶ 2 The Oklahoma Attorney General disagreed with Proponents' ballot title and then prepared and filed with the Secretary of State a new ballot title for the Initiative. Proponents disagreed with the ballot title prepared by the Attorney ·General and sought relief from this Court by filing an appeal from the new ballot title. Proponents' application for an order to disqualify the Attorney General from participation in this proceeding was withdrawn by counsel for Proponents during oral argument before the Court *en banc* and need not be addressed.

## I. Attorney General's Jurisdiction to File a New Ballot Title

Proponents claim that the Attorney General lost jurisdiction to file a new ballot title because the Attorney General's objection to Proponents' ballot title was untimely filed with the Secretary of State.

¶ 3 On Wednesday, September 18, 2013, Initiative Petition No. 397, State Question 767, was filed with Secretary of State by Proponents. On Thursday, September 19, 2013, the Secretary of State sent a notice by Interagency Mail to the Attorney General that an initiative petition had been filed and submitted a copy of the ballot title to the Attorney General. The Attorney General states that the notice from the Secretary of State was received on Friday, September 20, 2013. On Friday September 27, 2013, the Attorney General filed with the Secretary of State a notice that the ballot title did not comply with applicable laws, and that pursuant to 34 O.S.2011 § 9(D) he would prepare and supply to the Secretary of State a ballot title within ten days. On October 11, 2013, the Attorney General filed a ballot title with the Secretary of State.

¶ 4 Proponents argue that the Attorney General has five business days from the date the ballot title is filed with the Secretary of State to file an objection to a ballot title.

They submit that they filed the ballot title on Wednesday September, 18, 2013, and that the Attorney General's objection filed on Friday, September 27, 2013, was beyond the five-day limit. They contend that the Attorney General lost jurisdiction to file an objection when the five-day period expired.

¶ 5 The Attorney General argues that the five-day period for him to file an objection to a ballot title commences when a ballot title is *filed with the Attorney General by a proponent.* The Attorney General submits that the Proponent failed to file the ballot title with the Attorney General and that this five-day period never commenced. Proponents argue that they are *not* required to file copies of a proposed initiative and ballot title with the Attorney General. The Attorney General also argues that his objection to the ballot title was filed with the Secretary of State within five business days from the date he received copies of the initiative petition and ballot title from the Secretary of State via interagency mail.

¶ 6 The parties have different views on the meaning of language in 34 O.S.2011 § 9(A), (B), & (D). The relevant language states that:

A. When a referendum is ordered by petition of the people against any measure passed by the Legislature or *when any measure is proposed by initiative petition,* whether as an amendment to the Constitution or as a statute, *it shall be the duty of the parties submitting the measure to prepare and file one copy of the measure with the Secretary of State and one copy with the Attorney General.*

34 O.S.2011 § 9(A) (emphasis added).

B. *The parties submitting the measure shall also submit a suggested ballot title which shall be filed on a separate sheet of paper and shall not be deemed part of the petition* . . . .

34 O.S.2011 § 9(B) (emphasis added).

D. The following procedures shall apply to ballot titles of referendums ordered by a petition of the people or any measure proposed by an initiative petition:

1. *After the filing of the petition and prior to the gathering of signatures there-*

*on, the Secretary of State shall submit the proposed ballot title to the Attorney General for review as to legal correctness. Within five (5) business days after the filing of the measure and ballot title, the Attorney General shall, in writing, notify the Secretary of State whether or not the proposed ballot title complies with applicable laws . . . .*

34 O.S.2001 § 9(D)(1) (emphasis added).

¶7 Section 9(A) states that the "parties submitting the measure" must prepare and file one copy of the "measure" with the Secretary of State and one copy with the Attorney General In § 9(A) "submitting the measure" identifies who is required to file a copy of the measure *with both the Attorney General and the Secretary of State.*

¶8 Section 9(B) states that the parties "submitting the measure" "shall also submit a suggested ballot title . . . ." Section 9(B) does not expressly identify the Secretary of State, Attorney General or both are to receive the submitted ballot title. However, a party's duty to submit the ballot title is expressly stated to be performed *with the act* of submitting the proposed measure to the Attorney General and Secretary of State. Section 9(B) plainly states that the parties "submitting the measure" shall also submit a suggested ballot title.

¶9 The primary goal in reviewing a statute is to ascertain legislative intent, if possible, from a reading of the statutory language in its plain and ordinary meaning.[1] This is so because the plain words of a statute are deemed to express legislative authorial intent in the absence of any ambiguity or conflict in language.[2] The test for ambiguity in a statute is whether the statutory language is susceptible of more than one reasonable interpretation.[3] Generally, and consistent with a court's construction of alleged ambiguity in a contract,[4] a judicial determination of the presence of more than one reasonable construction of the statutory language, *i.e.*, ambiguity, presents a question of law[5] because the determination that a statutory construction is reasonable is based initially on a plain meaning of the words in the statute where no fact is disputed.[6] The

1. *W.R. Allison Enters., Inc. v. CompSource Okla.*, 2013 OK 24, ¶15, 301 P.3d 407, 411. The plain meaning of a statute's language is conclusive except in the rare case when literal construction produces a result demonstrably at odds with legislative intent. *Head v. McCracken*, 2004 OK 84, ¶13, 102 P.3d 670, 680.

2. *State ex rel. Bd. of Regents of Univ. of Oklahoma v. Lucas*, 2013 OK 14, ¶15, 297 P.3d 378, 387 ("If wording in a statute is plain, clear and unambiguous then the plain meaning of the words used must be judicially accepted as expressing the intent of the Legislature, and there exists no reason or justification to use interpretive devices or rules of construction to determine meaning."); *Cline v. Oklahoma Coalition for Reproductive Justice*, 2013 OK 93, ¶14, 313 P.3d 253, 258–259 (to determine the meaning of legislation we look to the plain language of the statute because the Legislature is presumed to have expressed its intent in the text of the statute; and only when the legislative intent cannot be ascertained from the statutory language in cases of ambiguity or conflict do we utilize rules of statutory construction); *Rogers v. Quiktrip Corp.*, 2010 OK 3, ¶11, 230 P.3d 853, 859 ("If a statute is plain and unambiguous, it will not be subjected to judicial construction but will receive the interpretation and effect its language dictates.").

3. *In the Matter of J.L.M.*, 2005 OK 15, ¶5, 109 P.3d 336, 338.

4. *Colclasure v. Colclasure*, 2012 OK 97, ¶10, 295 P.3d 1123, 1135 ("The courts decide, as a matter of law, whether a contract provision is ambiguous.").

5. In the context of construing a statute we stated that whether language is ambiguous is a question of law, and we relied upon a similar statement applied to an insurance policy and the application of contract law. *YDF, Inc. v. Schlumar, Inc.*, 2006 OK 32, ¶6, 136 P.3d 656, 658, citing *American Economy Ins. Co. v. Bogdahn*, 2004 OK 9 ¶11, 89 P.3d 1051, 1054.

 One reason *YDF, Inc., supra,* is correct is that a court's interpretation of statutory law presents a question of law. *Troxell v. Okla. Dept. of Human Services*, 2013 OK 100, ¶4, 318 P.3d 206. *See Hogg v. Okla. Cnty. Juvenile Bureau*, 2012 OK 107, ¶7, 292 P.3d 29, 33 ("Ascertaining the meaning of statutory language is a pure issue of law."); *In re De-Annexation of Certain Real Property from City of Seminole*, 2004 OK 60, ¶18, 102 P.3d 120, 129 ("Statutory construction presents a question of law."). An interpretation of ambiguity solely from the statutory language is thus an interpretation of statutory law and presents an issue of law.

6. In a general sense, a court's adjudication of "reasonableness" may present an issue of fact, or an issue of law, or a mixed question of law and fact, depending upon how the concept of "rea-

502

plain language of § 9(A) & (B) states that the ballot title is submitted with the measure, and the measure is submitted *to both the Attorney General and the Secretary of State.* We hold that Proponents were required to file or submit a copy of initiative petition and a copy of the ballot title to the Attorney General when they filed the initiative petition and ballot title with the Secretary of State.

¶ 10 The next argument made by the parties is whether the five business days for the Attorney General to object to a ballot title commence on (1) the day a proponent files the initiative petition and ballot title with the Secretary of State, or (2) the date the initiative petition and ballot title are filed with the Attorney General, or (3) the date the Attorney General receives notice from the Secretary of State that an initiative petition and ballot title have been filed.

¶ 11 The Attorney General's argument is that 34 O.S. § 9 should be construed to mean that the filed copy of the ballot title which it reviews for legal correctness is the one filed with the Attorney General, and that the filing of this copy with the Attorney General is also the event which commences the Attorney's General's five-day period to file an objection to the ballot title. We reject that construction of 34 O.S. § 9, as contrary to the plain language of that statute.

¶ 12 The statutory language providing the Attorney General five business days to object to a ballot title does not occur in isolation from the rest of the statute in which it appears. The five-day period occurs not in paragraphs "A" or "B" but in paragraph "C" and immediately following a sentence stating that: "After the filing of the petition and prior to the gathering of signatures thereon, the Secretary of State shall submit the proposed ballot title to the Attorney General *for review as to legal correctness.*" This sen-

tence refers to the Secretary of State performing the act of submitting a copy of the ballot title to the Attorney General "for review as to legal correctness." The plain language of the statute states that the reason the Secretary of State submits a copy of the ballot title to the Attorney General is for the Attorney General to determine the legal correctness of the ballot title. Because of this duty on the Secretary of State to submit a copy of the ballot title to the Attorney General for review as to legal correctness, we conclude that the copy that the Secretary of State submits to the Attorney General is a copy of the ballot title filed of record with the Secretary of State.

¶ 13 Further, the language "[w]ithin five (5) business days *after the filing of the measure and ballot title* the Attorney General shall, in writing, notify the Secretary of State whether or not the proposed ballot title complies with applicable laws" occurs immediately after language stating that the Secretary of State has a duty to provide a copy of the ballot title to the Attorney General for the purpose of this determination. The statutory language does not state that the five-day period commences upon the date the Attorney General receives notice of the filing from the Secretary of State.

¶ 14 During oral argument before the Court *en banc,* counsel for the Attorney General argued that the Attorney General's construction of 34 O.S. § 9 was a long-standing construction of a statute by a state agency, and that a long-standing construction should be given deference by the Court. We agree that deference may be afforded to the long-standing construction of a statute by a state agency.[7] We also recognize that continual construction of a statute by the agency charged to enforce it must be given great weight; and that when the Legislature has

sonable" or "reasonableness" is applied for the type of adjudication at issue. *See, e.g., Franco-American Charolaise, Ltd. v. Okla. Water Resources Bd.,* 1990 OK 44, 855 P.2d 568, 574–575 (discussion of the reasonableness of water use by a riparian owner and the conclusion that the issue was for a jury); *Barringer v. Baptist Healthcare of Oklahoma,* 2001 OK 29, ¶¶ 6, 26, 22 P.3d 695, 697, 701 (an example of determinations of "reasonableness" in the context of summary

judgment review, and whether one or more than one reasonable interpretation of undisputed facts is present. In this original jurisdiction matter we are asked to adjudicate the meaning of statutory language and not the existence of extrinsic facts.

7. *United Airlines, Inc. v. State Bd. of Equalization,* 1990 OK 29, 789 P.2d 1305, 1311–1312.

convened many times during a period in which an administrative agency has construed a statute and it has not expressed its disapproval with that construction, the Legislature's silence may be regarded as acquiescence in or approval of the agency's construction.[8] However, upon a closer examination of the Attorney General's argument, we conclude that these principles do not apply.

¶ 15 Generally, a published Attorney General Opinion *may* be persuasive authority for a court, but a court is not bound by the Opinion of the Attorney General.[9] It is also correct that legislative silence after promulgation of a published Attorney General Opinion may be judicially construed as a legislative approval of an Attorney General's construction of an ambiguous and uncertain statute.[10] But in the matter before us, no published Attorney General Opinion has been cited in support of the Attorney General's

construction of 34 O.S. § 9. We have no Attorney General Opinion before us that would allow us to examine its *ratio decidendi* for a quality of persuasiveness in legal argument. No published agency rule has been cited by the Attorney General.[11] The record of facts before us contains no reference to a previous public construction of 34 O.S. § 9 *by the Attorney General* on the issues before the Court.[12]

¶ 16 Deference given to a state agency's construction of a statute is based upon the statute's language being ambiguous or uncertain,[13] and the fact that the agency's construction must be legally reasonable when applied to the circumstance,[14] and the agency's construction must be consistent and continual in a public manner so that the Legislature has notice of the construction by the agency.[15] Is 34 O.S. § 9 ambiguous and

**8.** *United Airlines, Inc. v. State Bd. of Equalization*, 1990 OK 29, 789 P.2d at 1311–1312.

**9.** *Austin, Nichols & Co. v. Okla. Cnty. Bd. of Tax–Roll Corrections*, 1978 OK 65, 578 P.2d 1200, 1203.

**10.** *Okla. Public Employees Ass'n v. State ex rel. Okla. Office of Personnel Management*, 2011 OK 68, ¶ 24, 267 P.3d 838, 847.

**11.** The Court takes judicial notice of promulgated state agency rules. *Lone Star Helicopters, Inc., v. State*, 1990 OK 111, 800 P.2d 235, 237 (citing 75 O.S. § 252. which now states, in part, that "All courts, boards, commissions, agencies, authorities, instrumentalities, and officers of the State of Oklahoma shall take judicial or official notice of any rule, amendment, revision, or revocation of an existing rule promulgated pursuant to the provisions of the Administrative Procedures Act").

**12.** The *record of facts* before us fails to show a consistent and continual construction of the statute in a public manner by the Attorney General that is consistent with the Attorney General's argument. Generally, argument of counsel is not a form of evidence. *In re Guardianship of Stanfield*, 2012 OK 8, n. 55, 276 P.3d 989, 1002 (unsworn statements by counsel do not constitute evidence); *Willis v. Sequoyah House, Inc.*, 2008 OK 87, ¶¶ 12–13, 194 P.3d 1285, 1289–1290 (same). Also generally, proof consists in forms of testimony, deposition, affidavit, and other "acceptable evidentiary substitutes." *Willis*, 2008 OK 87, at n. 14, 194 P.3d 1285. A ballot title appeal is prosecuted in this Court in the form of an original jurisdiction proceeding where the parties submit proof in support of their legal

arguments, and they do not rely upon a record transmitted from a lower tribunal. While the Attorney General may have consistently and continually construed the statute as counsel states, proof of such a construction by the Attorney General is absent from the record before us.

**13.** We have explained, "Administrative construction cannot override the plain language of a statute. Where a statute is neither ambiguous nor of doubtful meaning, the rule that weight is to be given to an agency construction in determining the effect of the statute will not be applied." *Bradshaw v. Oklahoma State Election Bd.*, 2004 OK 69, ¶ 6, 98 P.3d 1092, 1094.

**14.** The construction of an ambiguous and uncertain statute by a state agency must also be reasonable for a court to give the construction deference and great weight. *Oral Roberts Univ. v. Okla. Tax Comm'n*, 1985 OK 97, 714 P.2d 1013, 1015. *See Independent Finance Institute v. Clark*, 1999 OK 43, ¶ 13, 990 P.2d 845, 851 (deference given to the construction of a statute made by an agency charged with its enforcement is a rule of construction for ambiguous statutory language, and the deference is based upon an agency construction that is reasonable and not clearly wrong).

**15.** In *R.R. Tway, Inc. v. Oklahoma Tax Comm'n*, 1995 OK 129, n. 3, 910 P.2d 972, 976, we declined to give judicial deference to an agency's construction of a state statute. We observed that there was no evidence in the record showing the agency's consistent and continual construction of the statute by a published agency rule, or that the agency had construed the statute in some other

uncertain? We think not, and rules of construction for determining legislative intent for an ambiguous statute are not needed in this case.

¶ 17 Prior to 1994, paragraph § 9(D) expressly provided for the five-day period to commence on the date the ballot title was filed "with the Attorney General." [16] In 1994 this language expressly stating that the five-day period commenced upon filing with the Attorney General was removed from the statute by legislative amendment.[17] The 1994 amendment also added language that the Secretary of State "shall submit the proposed ballot title to the Attorney General *for review as to legal correctness.*" [18] In one legislative act the Secretary of State was given the duty of providing a copy of the ballot title to the Attorney General for a review of the ballot title's legal correctness and the date to commence the five-day period for the Attorney General to file an objection was changed.[19]

¶ 18 During oral argument before the Court *en banc,* counsel for the Attorney General argued that a "five full days" were needed by the Attorney General to examine a proposed initiative and ballot title to make a correctly reasoned and informed approval of, or objection to, a ballot title, and that the Attorney's General's five-day limit should not be shortened by whatever means the Secretary of State may, in his or her discretion, use to provide a copy of the ballot title to the Attorney General In the absence of evidence to the contrary, a court will generally presume that a public official will act in good faith to perform the official's duties and will faithfully discharge the duties the law imposes on the official.[20] We decline to assume that a Secretary of State will select a method of notice that is inconsistent with 34 O.S. § 9(D). or that a Secretary of State is either unwilling or unable to convey a copy of the ballot title to the Attorney General *immediately upon its filing* when the Secretary of State performs this duty imposed by 34 O.S. § 9(D).

¶ 19 Because of the arguments of the parties, we must note that the day an

---

manner that would give notice to the Legislature of the agency's actions.

**16.** 34 O.S.Supp.1993 § 9(D)(1) stated that:

"Within five (5) business days after the filing of such copy and ballot title with the Attorney General, he shall, in writing, notify the Secretary of State whether or not the proposed ballot title is in legal form and harmony with the law. If the proposed ballot title is in harmony with the law the Attorney General shall so certify to the Secretary of State. Should such ballot title not be in proper form, in the opinion of the Attorney General, it shall be his duty, within ten (10) business days of determining that th proposed ballot title is not in proper form, to prepare and file a ballot title which does conform to the law; and"

**17.** Laws 1994, c. § 147, § 3, amending 34 O.S. Supp.1993 § 9, eff. May 3, 1994.

**18.** Laws 1994, c. § 147, § 3, amending 34 O.S. Supp.1993 § 9, eff. May 3, 1994, emphasis added.

**19.** Although doubt as to the meaning of a statute may be resolved by reference to its enacted history, *Independent Finance Institute v. Clark,* 1999 OK 43, ¶ 14, 990 P.2d at 851, our observation on the legislative history is not for the purpose of resolving doubt of concerning ambiguous language, but for the purpose of showing that the language which altered the time for calculating the Attorney General's duty to file a response to a ballot title is a plain and ordinary reading of the language and that the Attorney General's construction is not a reasonable alternative.

**20.** *Berryman v. Bonaparte,* 1932 OK 141, 155 Okla. 165, 11 P.2d 164, 167–168 ("A mere presumption of law applies only in the absence of evidence as to the fact, and flies out of the case upon the production of any evidence, but the presumption that public officials perform their duties casts the burden of proof upon the issue. We call attention to these matters in order that the learned counsel may not in the future become confused relative to general legal presumptions and the presumptions of law relative to public officials."). *See also, State ex rel. Okla. Corp. Com'n v. McPherson,* 2010 OK 31, ¶ 28, 232 P.3d 458, 465 ("But because of the presumption that officials will take proper actions subsequent to a demand letter, the taxpayer's [*qui tam*] interest does not come into being until the taxpayer shows that officials failed to take the proper actions after receiving the demand letter."); *State ex rel. Haning v. Department of Public Welfare,* 1952 OK 229, 206 Okla. 583, 245 P.2d 452, 455 ("The rule is well settled in this jurisdiction that in considering an action in mandamus against such public officials this court may exercise its judicial discretion in granting or denying the writ, and may in a proper case withhold the writ in anticipation of good faith performance of the declared statutory duty.").

initiative petition is filed with the Secretary of State is not counted as the first day of the five-day period because fractions of a day are disregarded in statutory computations which include more than one day and when there is no question of priority involved.[21] We must note that § 9(D) does not use the language suggested by the Attorney General that it is necessary that he be provided "five full days" to file a response to the ballot title. The statute requires the Attorney General's response *within* five days from the filing with the Secretary of State. We also note that the "five days" is further defined by the statute as five *business* days. We construe the phrase "business" to be consistent with 25 O.S. Supp.2012 § 82.1, and therefore exclude statutory "holidays" defined in § 82.1, so that a business day would be Monday through Friday, inclusive, and does not include Saturday, Sunday, or any statutorily listed holiday in § 82.1 which may fall *on any day within* the five-day period after the initiative petition and ballot title are filed with the Secretary of State.[22]

¶ 20 After a proponent submits a copy of both the proposed measure and ballot title to both the Secretary of State and the Attorney General, and before signatures are collected, the Secretary of State submits the proposed ballot title to the Attorney General for review as to legal correctness, and the Attorney General must respond within five business days, and the response must state whether a proposed ballot title complies with applicable laws.[23] If the Attorney General objects to the ballot title, then the Attorney General must file with the Secretary of State a corrected ballot title within "ten (10) business days of determining that the proposed ballot title is defective." [24]

¶ 21 The ballot title was filed with the Secretary of State on Wednesday, September 18, 2013. The first day of the five-day period was Thursday, September 19, 2013, and the fifth day was Wednesday, September 25, 2013. The response was filed by the Attorney General with the Secretary of State on Friday, September 27, 2013. The response was filed two days late. Proponents argue that the Attorney General had ten business days from September 25, 2013, to file a new ballot title and the new ballot title had to be filed by Wednesday, October 9, 2013. They argue that the ballot title filed by the Attorney General on Friday, October 11, 2013, was untimely and of no legal effect. However, if the filing of the Attorney General on September 27, 2013, although untimely, still retained legal efficacy, then the ballot title filed by the Attorney General on October 11, 2013, was on the tenth business day after he filed his initial response to ballot title.

¶ 22 Proponents argue that the 34 O.S. § 9(D) duty imposed on the Attorney General is a mandatory duty to file a response within five business days; and then if an objection to the ballot title is timely made, the duty to file a new ballot title within ten business days is also a mandatory duty. Proponents conclude that because the time

---

21. 25 O.S.2011 § 23:

"The word 'year' means a calendar year, and 'month,' a calendar month. Fractions of a year are to be computed by the number of months, thus: half a year is six (6) months. Fractions of a day are to be disregarded in computations which include more than one (1) day, and involve no question of priority."

22. 25 O.S. Supp.2012 § 82.1 states in part:

"A. The designation and dates of holidays in Oklahoma shall be as follows: Each Saturday, Sunday, New Year's Day on the 1st day of January, Martin Luther King, Jr.'s Birthday on the third Monday in January, . . . ."

"C. Any act authorized, required, or permitted to be performed on a holiday as designated in subsection A of this section may be performed on the next succeeding business day, and no liability or loss of rights of any kind shall result from such delay . . . ."

23. 34 O.S.2001 § 9(D)(1) states in part:

After the filing of the petition and prior to the gathering of signatures thereon, the Secretary of State shall submit the proposed ballot title to the Attorney General for review as to legal correctness. Within five (5) business days after the filing of the measure and ballot title, the Attorney General shall, in writing, notify the Secretary of State whether or not the proposed ballot title complies with applicable laws.

24. 34 O.S. § 9(D)(1) states in part: "The Attorney General shall state with specificity any and all defects found and, if necessary, within ten (10) business days of determining that the proposed ballot title is defective, prepare and file a ballot title which complies with the law; . . . ."

limit is mandatory it is also jurisdictional. They state that the Attorney General lost jurisdiction to respond to the ballot title and to file a new ballot title when he did not file within five days from the date the ballot title was filed with the Secretary of State.

 ¶ 23 Generally, the legal principle which has been followed in this jurisdiction for many years is that a public official performing a statutorily required duty will not be divested of jurisdiction to perform that duty by the mere passage of time unless the statute also states that the duty shall not be performed by that official after the expiration of a certain time or date. For example, in *School District No. 61, Payne County v. Consolidated District No. 2, Coyle, Logan County*, 1925 OK 518, 110 Okla. 263, 237 P. 1110, we stated the following:

> The case of *People v. Cook*, 14 Barb. (N.Y.) 259 [1852], seems to be one among the early cases passing upon this question, and is frequently referred to in later decisions, wherein the following rule is announced in the syllabus of the opinion:
>
>> Statutes directing the mode of proceeding by public officers are directory, and a strict compliance with their provisions is not essential to the validity of the proceedings, unless it be so declared in the statute. *Within this principle, where a statute directs a public officer to do a thing within a certain time, without any negative words restraining him from doing it afterwards, the naming the time will be regarded as directory merely, and not as a limitation of his authority.* This rule has been very steadfastly adhered to, by the courts, in all cases where certain acts are directed to be done, by public officers, within a stated time, and in a particular manner, when those acts are of a public character, and concern the public interests, or

when the rights of third persons are concerned.

A discussion of the rules announced in the syllabus above quoted will be found on page 290 and the following pages of the opinion, citing numerous authorities illustrating the application of the rules announced.

> In 25 R.C.L. p. 769, § 16, the following language is found:
>
> "In general, statutory provisions directing the mode of proceeding by public officers and intended to secure order, system, and dispatch in proceedings, and by a disregard of which the rights of parties cannot be injuriously affected, are not regarded as mandatory, *unless accompanied by negative words importing that the acts required shall not be done in any other manner or time than that designated.* * * * "

*School District No. 61, Payne County*, 237 P. at 1111 (emphasis added).

Application of *School District No. 61, Payne County, supra*, requires an examination of 34 O.S. § 9, and a determination if any words state that the acts required by the Attorney General shall not be done in any other manner or time than that designated. There is no express language in 34 O.S. § 9 which removes jurisdiction from the Attorney General to file an objection to a ballot title two days late, and there is nothing in the plain language of § 9 indicating a legislative intent to remove the Attorney General from the ballot title procedure by an untimely response to the filing of an initiative or ballot title.[25]

¶ 24 Our opinion in *School District No. 61, Payne County, supra*, was released in 1925

---

**25.** The argument made by Proponents has some similarities to one we rejected in *State ex rel Oklahoma Bar Ass'n v. Mothershed*, 2011 OK 84, 264 P.3d 1197. In *Mothershed* a party argued that Mure to follow the "shall" language requiring an act of a public official/public body within a certain time divested that public body of jurisdiction to act. In the present case, Proponents argue that a public official's failure to observe a statutory time requirement has divested that offi-

cial of jurisdiction to act. We explained in *Mothershed* that there was no legislative intent to create a jurisdictional time limit in a particular rule for Bar disciplinary procedure (at ¶ 62, 264 P.3d at 1221), and herein we similarly note that there is no legislative language or intent indicated by the plain language in 34 O.S. § 9 to remove the Attorney General from the ballot title procedure by an untimely filing made by the Attorney General

and applied a principle used by several courts since at least 1852.[26] Proponents have not made any argument that the holding in *School District No. 61, Payne County, supra,* has been superseded. The rationale used in *School District No. 61, Payne County, supra,* is found in other contexts such as the general rule that jurisdiction of a court, once correctly invoked, will not usually be divested by a subsequent event such as the passage of time unless a statute expressly states the contrary or if a legislative intent is shown that would make a time limit mandatory.[27] Proponents have not made any argument that a recognized public policy calls for modifying or overruling *School District No. 61, Payne County, supra.* The Legislature is certainly aware that in the context of the initiative process it may restrict a filing after a certain date, and appears to have used such language in 34 O.S.2011 § 4, where with reference to filing signature sheets with the Secretary of State it has enacted language stating that "additional signature sheets shall not be accepted after 5:00 p.m. on the ninetieth day." [28]

¶ 25 We recognize the possibility that a statute may express a mandatory requirement in the absence of *express* language stating that the requirement is mandatory. Several rules of construction may be used to make a determination whether express language is necessary to create mandatory law or alter certain legal interests in a particular circumstance.[29] Specifically, when examining whether statutory language is mandatory in the context of statutorily specified time limits, the Court may examine whether statutory time limits "attach directly to the *right* created." [30] Before us today we have no authority cited in either briefs or in oral argument concerning whether express language is necessary to show a mandatory statutory requirement in this context or whether the five-day limit attaches to a right itself. However, the issue presented is *publici juris* because it concerns the proper procedure used by the People when enacting legislation.[31] Because the issue is *publici juris* and no additional evidence is necessary to adjudicate an issue of law, we may nevertheless adjudicate the issue whether the five-day period is mandatory in nature.[32]

**26.** We note that *School District No. 61, Payne County, supra,* is consistent with *Castro v. Keyes,* 1992 OK 92, 836 P.2d 1275, where parties argued that a county board of equalization lacked jurisdiction to adjudicate a timely filed taxpayer protest when the adjudication came after the statutory date for adjournment for the board. This Court rejected that argument and we reaffirmed the holding of *Castro* in both *George L. Verity Management Development Corp. v. Keyes,* 1992 OK 93, 836 P.2d 1279, and *Oklahoma City Golf and Country Club v. Keyes,* 1992 OK 94, 836 P.2d 1282. *See Larry Jones Intern. Ministries, Inc. v. Means,* 1997 OK 125, ¶ 7, 946 P.2d 669, 671.

**27.** *State ex rel. Oklahoma Bar Ass'n v. Mothershed,* 2011 OK 84, ¶ 54, & nn 59–63, & ¶ 62, 264 P.3d 1197, 1217, 1221. *See also Baugh v. Little,* 1929 OK 383, 140 Okla. 206, 282 P. 459, 460 ("It is well established, as a general rule, that jurisdiction once acquired is not defeated by subsequent events, . . . .").

**28.** The nature of this time limit in 34 O.S.2001 § 4 and whether it is mandatory is not before us in the present controversy. It is noted merely to show an example of the Legislature restricting a filing after a certain date.

**29.** *See, e.g., McCathern v. City of Oklahoma City,* 2004 OK 61, ¶ 17, 95 P.3d 1090, 1097 ("We will not abridge governmental tort responsibility by legislative text that is ambiguous or silent."); *Satellite Sys., Inc. v. Birch Telecom of Oklahoma, Inc.,* 2002 OK 61, ¶ 7, 51 P.3d 585, 588 (A legislative intention to abolish a common law right must be clearly and plainly expressed and there is a presumption that favors preservation of common-law rights).

**30.** *Matter of Estate of Speake,* 1987 OK 61, 743 P.2d 648, 652.

**31.** *In re Initiative Petition No. 315, State Question No. 553,* 1982 OK 15, 649 P.2d 545, 553 ("when questions of a general public nature are involved, which affect the state at large, the people of the state become indirect parties and their interests must be protected to prevent a possible 'practical injustice' even if the person who might have objected is silent."); *State ex rel. Freeling v. Lyon,* 1917 OK 229, 63 Okla. 285, 165 P. 419, 420 (A matter that affects the rights of the citizens of the State is *publici juris.*); *Ethics Commission v. Cullison,* 1993 OK 37, 850 P.2d 1069, 1073 (An adjective-law barrier in a private-law original jurisdiction action will not hinder the court from giving adequate relief in an original jurisdiction proceeding that is *publici juris.*).

**32.** When the parties' briefs present a *publici juris* issue and no additional facts are necessary for its adjudication, the Court possesses the judicial discretion to determine an issue of law presented by

¶ 26 The purpose of the statutory initiative process is to provide a procedure where the People, the citizens of Oklahoma, exercise their right of initiative whereby they propose bills and laws and enact them or reject them at the polls independent of legislative assembly.[33] This right of the People to enact laws through an initiative petition process is reserved in Article V § 1 of the Oklahoma Constitution,[34] and we have explained that the People's right is a fundamental and precious right zealously protected by this Court.[35] Proponents view the Attorney General's participation in the initiative petition process in this case as an obstruction to the People's right of initiative. We disagree. As we explain herein, the Attorney General's participation is not as a typical counsel in an adversarial litigation dispute. An Attorney General does not use the People's initiative process as a vehicle to champion his or her political positions. An Attorney General's participation in an initiative process is as a neutral legal advisor for the People. The Attorney General is *required by statute* to give an opinion on a ballot title proposed with an initiative petition and is *required by statute* to defend ballot titles, either those filed by proponents which he approves, or those authored and filed by the Attorney General Participation by the Attorney General *in every initiative petition proceeding* is required by statute.

¶ 27 The Constitution grants to the People a right to an initiative and states that the Legislature shall make suitable provisions for carrying into effect this right,[36] and the statutorily required participation by the Attorney General in the ballot title process *is part of the initiative process for carrying into effect the right of the People.* As we note herein, a properly worded ballot title is one means used to combat fraud and deceit in the initiative process. The ballot title functions as a safeguard to protect the initiative right of the People, and "we will not cripple, avoid or deny by technical construction the initiative right." [37] This portion of Proponents' argument ultimately rests upon a technical construction that the five-day filing period for the Attorney General in 34 O.S. § 9(D) must be attached to a right possessed by, and litigated by, an Attorney General. We reject this view as contrary to the plain language of 34 O.S. § 9(D) and conclude that the five-day period § 9(D) does not attach directly to a statutorily created right possessed by the Attorney General. The plain language of the statute places a duty upon the Attorney General that is the nature of the exercise of a governmental function that is part of a legislative process used by the People.

¶ 28 Proponent's jurisdiction argument requires a determination whether the Legislature "had uppermost in mind" *the effect of the procedural step at issue* upon the process, and whether the Legislature intended it not as a "mere procedural step" but a requirement that was *essential* to the result of the process or the Legislature's intended goal.[38] In Proponents' argument, the "procedural step" which they urge as jurisdictional is the *timeliness* of the response filed by the Attorney General. However, we find no legislative intent in the plain language of the statute to make the *timeliness* of the re-

those briefs. *State v. Torres*, 2004 OK 12, ¶ 7, 87 P.3d 572, 578; *City of Enid v. Public Employees Relations Bd.*, 2006 OK 16, ¶ 30 133 P.3d 281, 299–300 (Edmondson, J., Concurring).

33. *Terry v. Bishop*, 2007 OK 29, ¶ 9, 158 P.3d 1067, 1070–1071.

34. Okla. Const. Art. 5 § 1:

"The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature."

35. *In re Initiative Petition No. 384, State Question No. 731*, 2007 OK 48, ¶ 2, 164 P.3d 125, 126.

36. Okla. Const. Art. 5 § 3 states in part: "The Legislature shall make suitable provisions for carrying into effect the provisions of this article."

37. *In re Initiative Petition No. 379, State Question No. 726*, 2006 OK 89, ¶ 17, 155 P.3d 32, 40.

38. *Gulfstream Petroleum Corp. v. Layden*, 1981 OK 56, 632 P.2d 376, 379 (principle applied to whether entry of a spacing order was a mere procedural step or a mandatory jurisdictional step in the process of entering a pooling order).

sponse an essential or critical step in the result of the initiative process.

¶ 29 Our conclusion will not impose any additional burden upon the People to propose initiatives. This is so because (1) the Attorney General concedes that timeliness of his actions may be controlled by mandamus, and (2) as explained herein, we recognize that a proponent's ninety-day period to collect signatures may commence after a ballot title appeal in accordance with the plain language and meaning of the ballot title statutes and prior opinions of this Court.

¶ 30 We have stated the general rule that "Those who challenge the validity of actions of public officials apparently within their statutory powers must carry the burden of demonstrating such invalidity." [39] Proponents have not met their burden to show that the Attorney General's filing two days late deprived the filing of legal effect. We reject the argument made by Proponents that the time limits for the Attorney General in 34 O.S. § 9(D) are jurisdictional. *We hold that the Attorney General's § 9(D) response to a ballot title required by law to be filed within five days from the date the ballot title is filed with the Secretary of State is statutorily effective although the Attorney General's filing is two days late.* School District No. 61, Payne County, *supra.*

■ ¶ 31 Although we reject Proponents' argument that the five-day time limit for the Attorney General in 34 O.S. § 9(D) is jurisdictional, we must note that an Attorney General may not thwart an initiative by fail-

ing to file a response to the filings with the Secretary of State. Counsel for the Attorney General observed in his brief and during oral argument that the proper judicial remedy for a violation of this five-day deadline would be a writ of mandamus to compel a response.[40] We also note that although the Attorney General states that mandamus may be used, he also invokes the substantial compliance standard of 34 O.S. § 24.[41]

■ ¶ 32 In some circumstances, judicial application of a substantial compliance standard to a duty to take an action within a defined period of time may result in an excused performance within that time period.[42] Although not *expressly* argued as a syllogism, when his § 24 substantial-compliance-standard argument is combined with his argument that *after receipt* of the ballot title *by the Attorney General* a "full five days" of legal research is needed by the attorney(s) assigned to review a proposed ballot title and file a response with the Secretary of State, he is essentially creating a syllogism with the conclusion that he should be excused from the five-day period for filing a response to a ballot title because factual circumstances prevent him from meeting this deadline. With this conclusion, the Attorney General's hypothetical mandamus action would not turn on whether the Attorney General had missed the five-day deadline, but whether the Attorney General had sufficient factual reasons for delay past the five-day deadline and only when such reasons were legally insufficient would the writ issue.[43] We decline to adopt this view.

---

39. *U.C. Leasing, Inc. v. State ex rel. State Bd. of Public Affairs,* 1987 OK 43, 737 P.2d 1191, 1196.

40. *Chandler U.S.A., Inc. v. Tyree,* 2004 OK 16, ¶ 24, 87 P.3d 598, 604 ("A typical case for mandamus has five elements: (1) The party seeking the writ has no plain and adequate remedy in the ordinary course of the law, (2) The party seeking the writ possesses a clear legal right to the relief sought, (3) The respondent (defendant) has a plain legal duty regarding the relief sought, (4) The respondent has refused to perform that duty, and (5) The respondent's duty does not involve the exercise of discretion."); *In the Matter of B.C.,* 1988 OK 4, 749 P.2d 542, 544 (Mandamus will not usually control the substantive content of an official's decision within the discretion of that official in the performance of a duty. But when the duty requires an exercise of discretion and the official has not performed, mandamus will

issue to require the official to actually exercise the required discretionary act.).

41. 34 O.S.2011 § 24: "The procedure herein prescribed is not mandatory, but if substantially followed will be sufficient. If the end aimed at can be attained and procedure shall be sustained, clerical and mere technical errors shall be disregarded."

42. *Cf. City of Tulsa v. Whittenhall,* 1929 OK 122, 140 Okla. 160, 282 P. 322 (notice of claim filed on thirty-first day was in substantial compliance with requirement for notice within thirty days because plaintiff was unable to provide notice within the thirty-day period).

43. See the discussion and application of a substantial compliance standard in *Henderson v. Maley,* 1991 OK 8, 806 P.2d 626, as to both (1) the

¶ 33 There is no suggestion or evidence before us from the Attorney General that fulfilling the duty to file an initial response to a ballot title takes more than five days. We assume that a Secretary of State will act in good faith and perform his or her duty and provide a copy of ballot title to an Attorney General immediately upon its filing. *Berryman v. Bonaparte, supra*. We also assume that an Attorney General will act in good faith and perform his or her duty and file a timely response to any ballot title filing with the Secretary of State. *Id*.

¶ 34 We agree with that part of the Attorney General's statement that the statutory role of the Attorney General in drafting a ballot title does not place him in the usual and ordinary adversarial posture that occurs in a litigation context, or provide him with a public platform to express political views. He represents all of the People in the context of either approving a ballot title written by others or providing one which he authors. The purpose of a ballot title along with the gist appearing on a signature page is to prevent deceit and fraud in the initiative process.[44] We agree with the Attorney General that he is required by statute to be made a defendant if anyone timely objects to a proposed ballot title,[45] and he must defend a ballot title, either one prepared by a proponent which he approved and did not alter, or one he authored and substituted for the initial title. His filing a response to the ballot title is an important step in the process of the initiative to help prevent deceit and fraud, and that filing should not be made ineffective in the absence of legislative intent requiring that result.

¶ 35 Ideally, in this limited role as a legal advisor to the People, the Attorney General is not merely reactive to a particular proponent of an initiative who fails to provide him with statutorily required notice, or merely reactive to a particular Secretary of State who selects a means of notice to the Attorney General that is less than immediate. But rather, that he takes positive action for a quick review of the ballot title once it is filed with the Secretary of State and he has notice of its filing. Ideally, a proponent of an initiative and a Secretary of State would provide the Attorney General with the types of notice which the statutes require and the Attorney General needs. We are confident that proponents of initiatives, the Secretary of State, and the Attorney General will work together in the future to avoid the procedural issues which are a large part of this controversy.

## II. Burden of Proof and Standard of Review

Proponents claim that in a ballot title appeal the Attorney General bears the burden of proof to show that a ballot title proposed by Proponents did not satisfy legal requirements.

¶ 36 Any person who is dissatisfied with the wording of ballot title for an initiative petition may bring a proceeding in this Court pursuant to 34 O.S. § 10.[46] The Attorney General is required to "defend the ballot title from which the appeal is taken." [47] Oklahoma Supreme Court Rule 1.194 provides that an objection to an initiative petition is commenced in the Supreme Court and the controversy proceeds in accordance with the procedures set out in 34 O.S. § 8. It further states that the proceeding shall be treated as an original action, and that the parties shall be afforded a trial *de novo*.[48] The procedure

---

issues in that controversy and (2) the standard applied in a prohibition proceeding, *Looney v. County Election Board of Seminole County*, 1930 OK 461, 146 Okla. 207, 293 P. 1056. *Henderson*, 806 P.2d at 630, 632.

**44.** *In re Initiative Petition No. 363, State Question No. 672*, 1996 OK 122, 927 P.2d 558, 567 (The terms of § 3 require that the petition contain a simple statement of the gist of the proposition, which is in contrast to § 9 which provides that the ballot title, in no more than 150 words, explain the effect of the proposition: "The pur-

pose of these two statutes is to prevent fraud, deceit or corruption in the initiative process.").

**45.** 34 O.S.2011 § 11 quoted *infra* at ¶ 37.

**46.** *See* 34 O.S.2011 § 10(A) quoted *infra* at ¶ 37.

**47.** *See* 34 O.S.2011 § 11 quoted *infra* at ¶ 37.

**48.** Oklahoma Supreme Court Rule 1.194:
"Proceedings to protest or to object to initiative and referendum petitions.
Proceedings in the Supreme Court to determine protests or objections to initiative and ref-

for an appeal of a ballot title is the same for proceedings challenging the petition when no statutory conflict necessarily exists between the statutes for the two types of proceedings.[49]

■ ¶ 37 Generally, statutes on the same subject matter are viewed *in pari materia* and construed together as a harmonious whole giving effect to each provision.[50] However, we need not rely on this principle as a rule of statutory construction because the plain language of 34 O.S. §§ 8, 9, 10 and 11 make express reference to each other and expressly require that the statutes be construed and applied together. For example:

> B. It shall be the duty of the Secretary of State to cause to be published, in at least one newspaper of general circulation in the state, a notice of such filing and the apparent sufficiency or insufficiency of the petition. *Such publication shall include the text of the ballot title as reviewed or, if applicable, as rewritten, by the Attorney General pursuant to the provisions of subsection D of Section 9 of this title, and shall include notice that any citizen or citizens of the state may file a protest as to the constitutionality of the petition, by a written notice to the Supreme Court and to the proponent or proponents filing the petition, or as to the ballot title as provided in Section 10 of this title. Any such protest must be filed within ten (10) days after publication. A copy of the protest shall be filed with the Secretary of State.*

34 O.S.2011 § 8(B) (emphasis added).

> A. Any person who is dissatisfied with the wording of a ballot title may, within ten (10) days after the same is published by the Secretary of State *as provided for in subsection B of Section 8 of this title,* *appeal to the Supreme Court by petition in which shall be offered a substitute ballot title for the one from which the appeal is taken. Upon the hearing of such appeal, the court may correct or amend the ballot title before the court, or accept the substitute suggested, or may draft a new one which will conform to the provisions of Section 9 of this title.*

34 O.S.2011 § 10(A) (emphasis added).

> Notice of the appeal *provided for in the preceding section* shall be served upon the Attorney General and upon the party who filed such ballot title, or on any of such parties, at least five (5) days before such appeal is heard by the court. The Attorney General shall, and any citizen interested may, defend the ballot title from which the appeal is taken *Other procedure upon such appeals shall be the same as is prescribed for appeals from petitions filed as set forth in Section 8 of this title.*

34 O.S.2011 § 11 (emphasis added).

The plain language in these statutes requires applying them together as a whole because: (1) § 8 refers to the Attorney General's ballot title in § 9 and an appeal with reference to § 10; (2) § 10 refers to both §§ 8 and 9 for application of § 10; and (3) § 11 refers to the appeal "provided for in the preceding section," (*i.e.*, § 10), and then incorporates consistent § 8 procedure for initiative appeals into the procedure for a ballot title appeal by using the phrase, "Other procedure upon such appeals shall be the same as is prescribed for appeals from petitions filed as set forth in Section 8 of this title." Section 9 refers to the requirements for a ballot title and the procedure for a ballot title prepared by the Attorney General, and it provides that if an appeal is taken from a ballot

erendum petitions shall be commenced and proceed in accordance with the procedures set out in 34 O.S. § 8.

The proceeding shall be treated as an original action and the parties shall be afforded a trial de novo. *In re Initiative Petition 281, State Ques. No. 441,* 1967 OK 230, 434 P.2d 941. If factual issues are raised, the Court may assign the matter to a referee.

The Court may issue directions when the procedure is not set out in 34 O.S. § 8. in this Rule, or in Part VI of these Rules."

**49.** 34 O.S.2011 § 11, states in part that: "... Other procedure upon such appeals shall be the same as is prescribed for appeals from petitions filed as set forth in Section 8 of this title."

**50.** *Tyler v. Shelter Mut. Ins. Co.,* 2008 OK 9, ¶ 1, 184 P.3d 496. *See also Taylor v. State Farm Fire and Cas. Co.,* 1999 OK 44, ¶ 19, 981 P.2d 1253, 1261 (All legislative enactments *in pari materia* are to be interpreted together as forming a single body of law that will fit into a coherent symmetry of legislation.).

title within the time specified in Section 10 of this title, then the Secretary of State shall certify to the Secretary of the State Election Board the ballot title which is finally approved by the Supreme Court. 34 O.S.2011 § 9(D)(2). These statutes clearly and plainly provide that any person who is dissatisfied with the ballot title may file an appeal in this Court, the Attorney General defends the action, the procedure for a ballot title appeal is governed by the specific statutes for such, and then additional consistent procedures from initiative appeals are incorporated into ballot title appeals by 34 O.S. § 11.

¶ 38 Proponents argue that the Attorney General has failed to meet his burden of proof in this proceeding. They argue that the Attorney General must meet the burden of showing that the ballot title proposed by Proponents is legally insufficient. We disagree with the conclusion made by Proponents.

¶ 39 Generally, the party invoking a court's judicial discretion with a request for judicial relief must satisfy the applicable burden for the relief sought. A burden to present facts, claims and legal arguments falls on the party who asserts an entitlement to the judicial relief sought.[51] An appeal of a ballot title is prosecuted using the Court's original jurisdiction.[52] In an original jurisdiction proceeding a petitioner has the burden to produce facts in support of a claim,[53] as well as a burden to present legal issues with supporting authority.[54] In the present context, the burden on Proponents is to raise legal issues in a procedurally proper manner and show those facts in a procedurally proper manner which are necessary to support the legal issues Proponents raise.

¶ 40 When an Attorney General changes a ballot title, the ballot title written by the Attorney General becomes *the ballot title* for that initiative unless the title is altered on an appeal to this Court. The Attorney General's ballot title is the one "from which the appeal is taken." 34 O.S. § 10. The party bringing an appeal shall file a "petition in which shall be offered a *substitute* ballot title." *Id.* In the present case, it is the ballot title filed by the Attorney General which is the ballot title of the initiative, unless changed on appeal The Court has accepted a ballot title written by an Attorney General when the Court could not conclude that the text for the ballot title was "clearly contrary" to the command of statutory law.[55] We have stated, "Where the title submitted by the Attorney General is found sufficient it is generally approved and utilized regardless of the sufficiency of those submitted by other parties."[56] The burden is on Proponents to show that the ballot title prepared by the Attorney General is clearly contrary to either statutory law or the Oklahoma Constitution.

### III. The Attorney General's Ballot Title

Proponents claim that the ballot title prepared by the Attorney General violates statutory law and displays partiality.

**51.** *State of Oklahoma, ex rel. State Insurance Fund v. Great Plains Care Center, Inc.,* 2003 OK 79, ¶ 29, 78 P.3d 83, 92. *See Colton v. Huntleigh USA Corp.,* 2005 OK 46, ¶ 10, 121 P.3d 1070, 1073 (The burden to show any particular fact or claim rests upon the party asserting such fact or claim as part of that party's action or defense. The phrase "burden of proof" is often used to refer to both (1) a burden of persuasion (which is a duty or obligation of establishing in the mind of the trier of fact a conviction on the ultimate issue), and (2) a burden to produce evidence in support of a party's claim or an affirmative defense. *Director, OWCP v. Greenwich Collieries,* 512 U.S. 267, 272–275, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994); *Johnson v. Board of Governors of Registered Dentists of the State of Okla.,* 1996 OK 41, n. 3, 913 P.2d 1339, 1350 (Opala, J., with Kauger, V.C.J. Concurring).

**52.** Oklahoma Supreme Court Rule 1.194, note 48, *supra.*

**53.** *Powers v. District Court of Tulsa County,* 2009 OK 91, n. 23, 227 P.3d 1060, 1070.

**54.** *S.W. v. Duncan,* 2001 OK 39, ¶ 31, 24 P.3d 846, 857 (in an original jurisdiction proceeding need not consider a claim that is unsupported by convincing argument or authority unless the claim is facially apparent without the need for legal research). *See also In re Initiative Petition No. 249, State Question 349,* 1950 OK 238, 203 Okla. 438, 222 P.2d 1032, 1034 (pursuant to 34 O.S.1941 § 8 in an initiative petition appeal the hearing in this Court is a trial *de novo* in which the burden rests upon the protestant to establish that party's various contentions).

**55.** *In re Initiative Petition No. 363, State Question 672,* 1996 OK 122, 927 P.2d 558, 571.

**56.** *In re Initiative Petition No. 347, State Question No. 639,* 1991 OK 55, 813 P.2d 1019, 1032.

¶ 41 Petitioners' initially proposed ballot title, now the substitute ballot title offered on appeal, states as follows:

This measure amends the Oklahoma Constitution. It adds a new section 44 to Article 10. Bonds could be sold. Up to Five Hundred Million Dollars ($500,000,-000.00) could be available. Bond money would be used for school districts and career technology districts. Bond money would be used for storm shelters or secure areas. State franchise taxes would repay these bonds. If money from franchise tax was not enough, the Legislature could use the General Revenue Fund to repay the bonds. State bond money could be used by school districts or career technology districts to reduce local debt or eliminate local debt incurred for storm shelters or secure areas. If enough money from franchise tax remains after state bonds are paid for, the balance of franchise tax could be used for grants for storm shelters for people and businesses. When state bonds are paid off, additional bonds could be sold to keep the programs funded. Laws would be written for details about using bond money. State agencies could make rules about state bond money. These rules would have the effect of law. The Oklahoma State Constitution is being amended to allow state bond money to pay for shelters and secure areas in schools.

¶ 42 The current ballot title for the initiative, the ballot title prepared by the Attorney General, states as follows:

This measure adds Article 10, Section 44 to the Oklahoma Constitution. The new section authorizes the issuance of up to 500 million dollars in State bonds. The bond money would be used by local school districts and career technology districts for storm shelters and campus security.

The measure does not provide for new State revenues to pay for the bonds. Under the measure the State franchise tax revenues would no longer go into the General Revenue Fund, which is the primary fund used to pay for State Government. Rather, franchise taxes revenues would be used for annual bond payments (principal and interest).

In any year in which the franchise tax revenues are not sufficient to make annual payments, the Legislature, at its discretion, could use General Revenue Fund monies to make the annual bond payment.

In years in which not all the franchise tax revenues are needed to make payments, the remaining franchise tax revenues—with Legislative approval—could be used for storm shelter grants to individuals and businesses.

In authorizing these bond and grant programs, the measure creates exceptions to the Constitution's prohibitions on gifts and the use of the state's credit.

¶ 43 A ballot title has six basic requirements set forth in 34 O.S. § 9(B). A suggested ballot title:

1. Shall not exceed two hundred (200) words;

2. Shall explain in basic words, which can be easily found in dictionaries of general usage, the effect of the proposition;

3. Shall not contain any words which have a special meaning for a particular profession or trade not commonly known to the citizens of this state;

4. Shall not reflect partiality in its composition or contain any argument for or against the measure;

5. Shall contain language which clearly states that a "yes" vote is a vote in favor of the proposition and a "no" vote is a vote against the proposition; and

6. Shall not contain language whereby a "yes" vote is, in fact, a vote against the proposition and a "no" vote is, in fact, a vote in favor of the proposition.

34 O.S.2011 § 9(B), in part.

¶ 44 Proponents' arguments against the Attorney General's ballot title are that it is legally incorrect and displays partiality. In their original brief the only argument challenging the ballot title is that it "is designed to over emphasize the franchise tax issue and under emphasize the true purpose of the Initiative which is storm shelters and secure areas for schools and children ... The proposal from the Attorney General is mislead-

ing, confusing and will not help the average voter when he or she votes." Their Supplemental Brief makes the following four arguments against the ballot title.

1. The second paragraph shows partiality because it makes an argument against the proposition because it states that no new revenues are raised to pay for the bonds;

2. The second paragraph shows partiality because it suggests potential harm to the General Revenue Fund since it states that the franchise tax revenue will not be deposited to that fund;

3. The second paragraph is legally incorrect because by the time the Proposed Measure is adopted the Legislature could direct franchise taxes to some fund other than the General Revenue Fund; and

4. "The last paragraph is legally incorrect since passage of the measure amends to [sic] Constitution to provide for such."

These first three arguments object to ¶ 2 of the title which states that:

The measure does not provide for new State revenues to pay for the bonds. Under the measure the State franchise tax revenues would no longer go into the General Revenue Fund, which is the primary fund used to pay for State Government. Rather, franchise taxes revenues would be used for annual bond payments (principal and interest).

¶ 45 Proponents object to the first sentence and state that it reflects partiality. The sentence: "The measure does not provide for new State revenues to pay for the bonds" is factually correct, as the measure states that the franchise tax in "section 1201 et seq. of Title 68" will be used to pay the bond obligation.

¶ 46 During oral argument before the Court *en banc*, Proponents refined this argument and used the language in the first sentence and the mention of "franchise tax" in more than one place in the ballot title as evidence of partiality. In other words, they argued that the Attorney General overem-phasized use of the franchise tax, and it is this overemphasis which shows partiality.

¶ 47 The proposed measure contains the following language.

E. The Legislature shall provide by law *for the apportionment of the revenues currently derived* from the levy of the *franchise tax* imposed for the privilege of doing business in this state as authorized pursuant to Section 1201 et seq. of Title 68 of the Oklahoma Statutes, as amended, *so that one hundred percent (100%) of such franchise tax revenue,* or so much thereof as may be required on an annual basis, *is dedicated for the repayment of the obligations* issued pursuant to the provisions of this section

F. The Legislature may provide by law *for the use of revenues derived from the levy of franchise tax* which are not required for repayment of obligations issued pursuant to the provisions of this section in order to provide a grant program for construction of storm shelters for individuals and business entities. Such program shall be administered by the Office of Emergency Management or its successor. The use of *franchise tax revenues* for storm shelters as authorized by this subsection shall be deemed in furtherance of a public purpose and shall not be deemed a gift of state tax revenues.

G. *If the revenues described by subsection E* of this section are insufficient to repay the obligations pursuant to the provisions of this section, the Legislature may use monies in the General Revenue Fund of the state not otherwise obligated, committed or appropriated in order to ensure the repayment of such obligations.

Two paragraphs of this proposed measure expressly refer to the franchise tax and one refers to "the revenues" which is a reference to revenue from the franchise tax. A ballot title shall explain the effect of a proposition. 34 O.S. § 9(B)(2). We may summarize the effect of these paragraphs and enumerate the references in the measure to franchise tax revenue as follows:

In paragraph "E"

(1) The Legislature shall provide by a legislative apportionment that 100% (or so

much as is needed) of the franchise tax revenue is dedicated to repayment of certain obligations.

In paragraph "F"

(2) The Legislature may use amounts from the franchise tax revenue that are not necessary for repayment of certain obligations for a grant program for construction of storm shelters for individuals and business entities.

(3) The use of franchise tax revenues for storm shelters as authorized by this subsection shall be deemed in furtherance of a public purpose and shall not be deemed a gift of state tax revenues.

In paragraph "G"

(4) *If the revenues described by subsection E of this section* [i.e., franchise tax revenues] are insufficient to repay the obligations pursuant to the provisions of this section, the Legislature may use monies in the General Revenue Fund

In the proposed measure there are three express references to the franchise tax revenue and one grammatical reference, or a total of four references. In the Attorney General's ballot title there are five references to the franchise tax revenue that are used to explain the four references we have identified in the proposed measure. We also note that the phrase "franchise tax(es)" expressly appears four times in Proponent's proposed ballot title.

¶ 48 The difference of one reference is attributed to the sentence in the Attorney General's ballot title which states that "Under the measure State franchise tax revenues would no longer go into the General Revenue Fund, which is the primary fund used to pay for State Government." The proposed meas-ure does refer to the General Revenue Fund in paragraph "G" of the measure but without giving a definition for "General Revenue Fund." This reference to the Fund in the proposed measure, as well as the express reference to the Fund in Proponent's substitute title, are not references to the franchise tax revenue going into the Fund prior to an enactment of the measure.

¶ 49 In one case we stated that a single sentence may express partiality and be argumentative, if when explaining a proposed measure it also includes what *other states* have done *or might do* with a proposal similar to that to be voted on by the citizens in Oklahoma.[57] For the purpose of examining partiality in a ballot title, we noted the difference between a ballot title stating what other States *might* do and what the proposed Oklahoma measure *would do under then current law*.[58] In this circumstance, the possibility of what voters in other states would do was considered to be beyond the legal effect or legal scope of the proposed measure; *i.e.*, it amounted to a policy argument and not a statement of a legal effect created by the enactment of the proposed measure.

¶ 50 A similar issue arose in another case where we discussed legal effect and noted that a portion of a ballot title was misleading. The misleading nature of language in the title was not because the title expressed something as a legal effect when it was a contingency, but because the title did not explain the correlation between the contingency and the legal effect of the measure.[59]

¶ 51 Current law states that the franchise tax shall be deposited into the General Revenue Fund.[60] Proponents do not dispute that the General Revenue Fund is the primary

---

**57.** *In re Initiative Petition No. 360, State Question No. 662,* 1994 OK 97, 879 P.2d 810, 820.

**58.** *In re Initiative Petition No. 360,* 1994 OK 97, 879 P.2d at 819.

**59.** *In re Initiative Petition No. 363,* 1996 OK 122, 927 P.2d at 569.

**60.** 68 O.S.2011 § 1203, states in part that: "There is hereby levied and assessed a franchise or excise tax upon every corporation, association, joint-stock company and business trust organized under the laws of this state. . . ."

68 O.S.2011 § 1208(A) & (B):
"A. It is hereby declared to be the purpose of Section 1201 et seq. of this title to provide for revenue for general governmental functions of the State of Oklahoma.

B. All monies collected under Section 1201 et seq. of this title shall be transmitted monthly to the State Treasurer of the State of Oklahoma to be placed to the credit of the General Revenue Fund of the state, to be paid out only pursuant to direct appropriations of the Legislature."

fund used to pay for state government.[61] While the measure does not state that the current franchise tax is paid into the General Revenue Fund, and the measure does not define "General Revenue Fund," one effect from the proposed measure is clearly to change the franchise tax revenue from deposit into the Fund to a dedicated purpose of funding the construction of storm shelters. Proponents argue that "[w]here the revenue of the franchise tax is currently being deposited is irrelevant and has no impact as to the legal correctness of the ballot title as it does not matter where such revenue is deposited since the petition would direct that the revenue from the franchise tax be used to repay the bond debt." Section 9(B) expressly states that the ballot title: "Shall explain in basic words, which can be easily found in dictionaries of general usage, the effect of the proposition." 34 O.S. § 9(B)(2). Since (1) the franchise tax is currently being collected and being used for one use (deposited in the General Revenue Fund) and the measure states a new use for the tax (to pay for bonds), and (2) one purpose of a ballot title is to explain the effect of a proposed measure with reference to current law, the Attorney General did not impermissibly explain that funds currently being deposited in one fund will be used for a different purpose. We do not find the one additional reference to the franchise tax and the definition of the General Revenue Fund to be argumentative or displaying partiality.

¶ 52 A ballot title shall not exceed two hundred words, 34 O.S. § 9(B)(1). We do not view the use of five references to the franchise tax as opposed to four to be excessive to the point of displaying partiality when the Attorney General is attempting to summarize a measure in less than two hundred words and uses grammatical shortcuts to achieve this goal.

¶ 53 Stating that funds currently deposited in one fund will be used for a different purpose does not, by itself state that a "harm" will occur to that fund. The claim that the title is contrary to law because the Legislature could change the state fund where franchise taxes are deposited, or change their use prior to a vote on the proposed measure, is a claim simply without merit. The ballot title is required to state its effect on current law. While it is certainly possible that a Legislature could create a law with an effective date sufficiently in the future so as to have an impact upon an initiative petition, Proponents have pointed to no law which has been created for a future effective date that would alter the proposed measure's legal effect.

¶ 54 Proponents object to the last paragraph of the Attorney General's ballot title and argue that it is legally incorrect. The last paragraph states: "In authorizing these bond and grant programs, the measure creates exceptions to the Constitution's prohibitions on gifts and the use of the state's credit." Their objection is that passage of the measure itself provides for amending the Constitution.

¶ 55 We note that while Proponents' substitute title does not mention gifts or the state's credit, the proposed measure states in paragraph "F" that the use of the franchise tax for the storm shelters as authorized by this subsection ". . . shall not be deemed a gift of state tax revenues" and in paragraph "M" the measure states that:

> The proceeds from the sale of obligations issued pursuant to the provisions of this section may be made available to any common school district or any career technology district for the purposes authorized by this section and enabling legislation enacted pursuant to this section not-

---

**61.** *See, e.g.,* Okla. Const. Art. 10 § 23:

"To ensure a balanced annual budget, pursuant to the limitations contained in the foregoing, procedures are herewith established as follows:

1. Not more than forty-five (45) days or less than thirty-five (35) days prior to the convening of each regular session of the Legislature, the State Board of Equalization shall certify the total amount of revenue which accrued during the last preceding fiscal year to the General Revenue Fund and to each Special Revenue Fund appropriated directly by the Legislature, and shall further certify amounts available for appropriation. . . .

4. Surplus funds or monies shall be any amount accruing to the General Revenue Fund of the State of Oklahoma over and above the itemized estimate made by the State Board of Equalization. . . ."

withstanding any other provision of the Oklahoma Constitution that would otherwise prohibit or restrict the use of such proceeds or the use of tax revenue for the repayment of principal, interest, reserves, issuing costs or other costs related to the sale of the obligations authorized by this section. Any provision of the Oklahoma Constitution that would otherwise restrict the use of tax revenues for repayment of the obligations or in any way restrict the operation of the provisions of this section shall be deemed to have been amended in order to remove any such restrictions.

Proponents argue that the proposed measure states that the Constitution "is amended," and their substitute ballot title states that "The Oklahoma State Constitution is being amended to allow state bond money to pay for shelters and secure areas in schools." The Attorney General argues that while bond money is to be used to pay for shelters, the proposed measure also enacts a means or method for attaining this goal or ultimate purpose, and that means is achieved by amending the Constitution and creating exceptions to the Constitution's prohibitions on gifts and the use of the state's credit. Proponents' have not demonstrated that the Attorney General has incorrectly stated the legal effect of the measure on this point.

¶ 56 Proponents also argue that the Attorney General makes a claim that "there may not be any funds available to pay the bond holders," and Proponents argue that the statement " . . . is false, so this false statement is irrelevant to the legal correctness of the ballot title as submitted by the Petitioners." The Attorney General's ballot title does not contain this language. The actual statement in the ballot title is: "In any year in which the franchise tax revenues are not sufficient to make annual payments, the Legislature, at its discretion, could use General Revenue Fund monies to make the annual bond payment." The actual statement in the proposed measure states that:

G. If the revenues described by subsection E of this section are insufficient to repay the obligations issued pursuant to the provisions of this section, the Legislature may use monies in the General Revenue Fund of the state not otherwise obligated, committed or appropriated in order to ensure the repayment of such obligations.

The language in the Attorney General's ballot title summarizes this language in the proposed measure and is not misleading.

¶ 57 Proponents argue that the Attorney General's ballot title creates doubt whether the Legislature is required to repay the bond obligations. Again the actual provision of the Attorney General's ballot title states that: "In any year in which the franchise tax revenues are not sufficient to make annual payments, the Legislature, at its discretion, could use General Revenue Fund monies to make the annual bond payment" Again, this language summarizes paragraph "G" of the measure and is not misleading. The Attorney General correctly indicates that the Legislature could use funds from the General Revenue Fund or from another source to repay the bond obligations. Paragraph "G." of the proposed measure states that " . . . the Legislature *may* use monies in the General Revenue Fund of the state . . . ." (emphasis added). The Attorney General's ballot title language is not a false statement.

¶ 58 Proponents state that the ballot title reflects partiality because it states that franchise taxes will not be paid into the General Revenue Fund. The substitute ballot title *by Proponents* discusses a relationship between the franchise tax and the General Revenue Fund: "If money from franchise tax was not enough, the Legislature could use the General Revenue Fund to repay the bonds." Proponents challenge the *meaning* of language on a point which they have in their substitute ballot. The Attorney General's language explains the effect of the proposition, and under current law, is factually correct. This objection is without merit.

¶ 59 If the Attorney General's text for the ballot title is not "clearly contrary" to the command of statutory law, then his ballot title is accepted and the Court need not examine Petitioners' substitute ballot. A ballot title must reflect the character and purpose of the measure and it must not be deceptive or misleading and it must also be

free from uncertainty and ambiguity.[62] We have stated that: "The test is whether the title is couched in such a way that voters are afforded an opportunity to fairly express their will, and whether the question is sufficiently definite to apprise voters with substantial accuracy what they are asked to approve." [63]

¶ 60 Nothing in Proponents' arguments show where the Attorney General's ballot title fails to state the legal effect of the proposed measure under current law. Further, we conclude that the Attorney General's proposed ballot title fulfills the requirements of 34 O.S.2001 § 9, because it accurately reflects the effects of the proposed amendment to the State Constitution by informing the electorate concerning the principle thrust of the proposition; *i.e.,* to fund the construction of storm shelters by using franchise tax revenues, bonds, and other resources within the discretion of the Legislature.

## IV. Request for Time to Collect Signatures

Proponents request additional time to collect signatures, or in the alternative a new ninety-day period to collect signatures.

■■■ ¶ 61 In their Supplemental Brief, Proponents cite 34 O.S. § 8(E) and request an additional ninety (90) days to collect signatures, and they make a more developed argument in their Reply Brief where they rely upon *In re Initiative Petition No. 315, State Question No. 553,* 1982 OK 15, 649 P.2d 545, 553 and 34 O.S. § 9(D) and a former version of 34 O.S. § 8.

¶ 62 *In re Initiative Petition No. 315, supra,* states that "The 90–day period for circu-lation does not begin until the proposed title has been reviewed by the Attorney General, the 10–day appeal period has expired, and any appeals timely filed, exhausted." 649 P.2d at 553. The Attorney General argues that: (1) When *In re Initiative Petition No. 315, State Question No. 553, supra,* was decided the ballot title was *part of the petition* that was submitted to the Attorney General, (2) The ballot title is no longer *part of the petition* submitted to the Attorney General, and (3) The language in *In re Initiative Petition No. 315,* is no longer good law on this point.

¶ 63 The Attorney General's argument may be summarized as stating that the correctness of a ballot title need not be settled prior to collection of signatures because (1) the ballot title is not part of the petition when it is submitted to the Attorney General, (2) §§ 9 & 10 do not expressly delay collecting signatures until after a ballot title appeal has been settled, and (3) the petition and the gist of the measure on the signature page sufficiently inform the voters of the proposed measure.

¶ 64 Three bodies of text must be identified: (1) the petition, (2) the gist of the petition which appears on a signature page, and (3) the ballot title, which may, or may not be part of the petition for certain purposes (as we hold today). We have explained that both the gist and the ballot title work together to prevent fraud in the initiative process.[64] A petition has "an exact copy of the title and text of the measure inserted." [65] The petition and signature sheets together make a pamphlet, and each signature sheet is attached to a copy of the petition and has a gist of the measure on each signature page.[66]

---

**62.** *In re Initiative Petition No. 360, State Question No. 662,* 1994 OK 97, 879 P.2d 810, 818.

**63.** *In re Initiative Petition No. 360,* 1994 OK 97, 879 P.2d at 818.

**64.** *In re Initiative Petition No. 363, State Question No. 672,* 1996 OK 122, 927 P.2d 558, 567 (The terms of § 3 require that the petition contain a simple statement of the gist of the proposition, which is in contrast to § 9 which provides that the ballot title, in no more than 150 words, explain the effect of the proposition: "The purpose of these two statutes is to prevent fraud, deceit or corruption *in the initiative process.*") (emphasis added).

**65.** 34 O.S.2011 § 2 states in part that: "The question we herewith submit to our fellow voters is: Shall the following bill (or proposed amendment to the Constitution or resolution) be approved? (Insert here an exact copy of the title and text of the measure.)"

**66.** 34 O.S.2011 § 3 (emphasis added):

"*Each initiative petition* and each referendum petition *shall be duplicated for the securing of*

If "the title" referred to in § 2 that is to be included as part of the circulated petition is not the correct "ballot title," and the correct ballot title need not be included on the circulated petition pamphlet, as indicated by the Attorney General, then one purpose of a ballot title in limiting fraud, deceit, and corruption in the initiative process would be severely limited.

¶ 65 The Attorney General correctly observes that the ballot title is treated as separate from the initiative petition in 34 O.S. § 9. The ballot title is also treated as part of the petition in 34 O.S. § 2. Giving effect to both of these provisions means that the ballot title is not part of the petition for the purpose of a ballot title appeal, but a ballot title is part of the initiative petition in 34 O.S. § 2, and thus part of the petition that is duplicated for securing signatures in 34 O.S. § 3.

¶ 66 Section 9(D)(1) clearly provides for filing the ballot title with the Secretary of State prior to collecting signatures. If an appeal is taken from the ballot title, then the Secretary of State certifies to the Secretary of the State Election Board the ballot title that is "finally approved by the Supreme Court." 34 O.S. § 9(D)(2).

¶ 67 Section 8(E) provides in part that:

E. Within ninety (90) days after such filing of an initiative petition or determination of *the sufficiency of the petition* by the Supreme Court as provided in this section, *whichever is later,* the signed copies thereof shall be filed with the Secretary of State, . . . .

34 O.S.2011 § 8(E), in part, emphasis added.

Proponents argue that "sufficiency of the petition" should include determination of a proper ballot tide. While we agree that § 8(E) applies to a ballot title appeal and that the 90–day period to collect signatures commences after the ballot title appeal, our reasons are not those of Proponents.

¶ 68 The Attorney General is correct that the statutory scheme distinguishes a protest challenging the sufficiency of a petition from a protest (or appeal) of the ballot title, and this distinction is expressly made in § 8(B) where the separate authority for an appeal of the ballot title in § 10 is noted.[67]

. . . notice [shall include] that any citizen or citizens of the state may file *a protest as to the constitutionality of the petition,* by a written notice to the Supreme Court and to the proponent or proponents filing the petition, *or as to the ballot title as provided by Section 10* of this title . . . .

34 O.S.2011 § 8(B), in part, and emphasis added.

The Attorney General also argues that a "petition" does not include the ballot title, because a "ballot title" is submitted on a separate piece of paper "and shall not be deemed part of the petition." 34 O.S.2011 § 9(B).[68] Two responses to this argument by the Attorney General are necessary. First, even with a statutory distinction between appeals on a ballot title and appeals on the legal sufficiency of a petition, one statute *for a ballot title appeal* states that the proce-

*signatures,* and *each sheet for signatures shall be attached to a copy of the petition. Each copy of the petition and sheets for signatures is hereinafter termed a pamphlet.* On the outer page of each pamphlet shall be printed the word "Warning", and underneath this in ten-point type the words, "It is a felony for anyone to sign an initiative or referendum petition with any name other than his own, or knowingly to sign his name more than once for the measure, or to sign such petition when he is not a legal voter". A simple statement *of the gist* of the proposition shall be printed on the top margin of each signature sheet. Not more than twenty (20) signatures on one sheet on lines provided for the signatures shall be counted. Any signature sheet not in substantial compliance with this act shall be disqualified by the Secretary of State."

67. 34 O.S.2011 § 10(A):

"A. Any person who is dissatisfied with the wording of a ballot title may, within ten (10) days after the same is published by the Secretary of State as provided for in subsection B of Section 8 of this title, appeal to the Supreme Court by petition in which shall be offered a substitute ballot title for the one from which the appeal is taken. Upon the hearing of such appeal, the court may correct or amend the ballot title before the court, or accept the substitute suggested, or may draft a new one which will conform to the provisions of Section 9 of this title."

68. 34 O.S.2011 § 9(B) states in the first sentence of the paragraph: "The parties submitting the measure shall also submit a suggested ballot title which shall be filed on a separate sheet of paper and shall not be deemed part of the petition."

dures which are part of a 34 O.S. § 8 appeal on a petition are also applicable to a ballot title appeal

Notice of the appeal provided for in the preceding section shall be served upon the Attorney General and upon the party who filed such ballot title, or on any of such parties, at least five (5) days before such appeal is heard by the court. The Attorney General shall, and any citizen interested may, defend the ballot title from which the appeal is taken. *Other procedure upon such appeals shall be the same as is prescribed for appeals from petitions filed as set forth in Section 8 of this title.*

34 O.S.2011 § 11. emphasis added.

The procedure in § 8(E)[69] states that signatures will not be collected until after a protest to a petition is finally determined. There is no express provision in the ballot title statutes for the ninety-day signature collection period as occurring either during or after a ballot title appeal. We thus hold that § 8(E) procedure for collecting signatures in a ninety-day period at the conclusion of a protest to a petition is also applicable to a ballot title appeal.

¶ 69 We also note that the Attorney General correctly identifies three types of legal proceedings involving initiative petitions: (1) protest to the constitutionality of the petition [§ 8(B) proceeding], (2) protest to the ballot title [§§ 8(B) & 10 proceeding], and (3) an objection to the signature count [§ 8(H) proceeding]. The approach to these proceedings taken by the Attorney General would result in different times to commence collecting signatures based upon whether a protest to a petition was combined with a ballot title protest. According to the Attorney General, if only a ballot title protest is filed, then the 90–day period is not stayed pending resolution of the ballot title appeal On the other hand, if a protest to the petition is combined with a ballot title protest, then the 90–day period does not commence until the protest

to the petition is determined, which may or may not be the same date the Court decides the ballot title appeal; but in any event the date of any judicial decision(s) for commencing the ninety-day period would be different than for a ballot title. The last sentence of 34 O.S. § 11 requires more uniformity in procedure than that suggested by the Attorney General The second response we have to the argument by the Attorney General is that the ballot title, that is the correct ballot title, must be part of the petition which in turn is part of the circulated pamphlet.[70] A correct ballot title on the face of the initiative petition which is used during collection of signatures helps to prevent fraud and deceit in the initiative process.

¶ 70 A proponent has ninety days to collect signatures and file them with the Secretary of State. 34 O.S. § 8(E). and 34 O.S.2011 § 4.[71] The Attorney General is correct that a proponent gets *only one* 90–day period to collect signatures. Because of 34 O.S. §§ 2, 3, 8(E) and 11, the ninety-day period *commences* or *begins* for Proponents herein in accordance with our holding in *In re Initiative Petition No. 315, supra,* where we stated that when a ballot title appeal has occurred the time to collect signatures *does not begin until completion of that appeal. Id.* 649 P.2d at 553.

## V. Conclusion and Rehearing

¶ 71 *We hold that:* 1. A proponent of an initiative petition must file or submit a copy of the initiative petition and a copy of the ballot title to the Attorney General when the proponent files the initiative petition and ballot title with the Secretary of State, 34 O.S. § 9(A) & (B); 2. The Attorney General must file a response to a ballot title within five business days from the date the ballot title is filed with the Secretary of State, 34 O.S. § 9(D); 3. The Attorney General's § 9(D) response to a ballot title is

---

**69.** 34 O.S.2001 § 8(E) states in part:

"Within ninety (90) days after such filing of an initiative petition or determination of the sufficiency of the petition by the Supreme Court as provided in this section, whichever is later, the signed copies thereof shall be filed with the Secretary of State. . . ."

**70.** 34 O.S.2011 §§ 2, 3 *supra,* at notes 65 and 66.

**71.** Additional signature sheets "shall not be accepted [by the Secretary of State] after 5:00 p.m. on the ninetieth day." 34 O.S.2011 § 4, explanatory phrase added.

statutorily effective although the Attorney General's response was filed two days late; 4. A proponent of an initiative who challenges a ballot title prepared by the Attorney General has the burden to show that the Attorney General's ballot title is legally incorrect, or is not impartial, or fails to accurately reflect the effects of the proposed initiative; 5. The Attorney General's ballot title challenged in this proceeding is legally correct, impartial, and accurately reflects the effects of the proposed initiative; 6. When a ballot title appeal has been made, a proponent's ninety-day period of time to collect signatures commences when the ballot title appeal is final.

¶ 72 Should any party file a petition for rehearing, it must be filed within five business days from the date this opinion is filed with the Clerk of this Court.[72] The first day of this five-day period is the first business day occurring immediately after this opinion is filed with the Clerk. Any party may file a response to a petition for rehearing and a response to a petition for rehearing may be filed within eight (8) business days after the date this opinion is filed with the clerk of this Court. *The time limits to file a petition for rehearing and response shall not be extended.* If no petition for rehearing is filed within five business days from the date this opinion is filed with the Clerk of this Court, then the opinion shall be final on the sixth business day after the opinion is filed with the Clerk. If any rehearing petition is timely filed within the five-day period, then the opinion shall not become final until all requests for rehearing are adjudicated.

¶ 73 CONCUR: REIF, V.C.J., KAUGER, WATT, WINCHESTER, EDMONDSON, TAYLOR, COMBS, GURICH, JJ.

¶ 74 NOT VOTING: COLBERT, C. J.

---

**72.** This Court may set the time for a party to file a petition for rehearing. *Fent v. Henry,* 2011 OK 10, ¶ 23, 257 P.3d 984, 995.